In the
United States Court of Appeals
For the Seventh Circuit

No. 00-4169

CLYDE PUGH,

Plaintiff-Appellant,

v.

CITY OF ATTICA, INDIANA, ATTICA POLICE
DEPARTMENT, ATTICA BOARD OF WORKS, et al.,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 99 C 840--S. Hugh Dillin, Judge.

ARGUED JUNE 4, 2001--DECIDED July 26, 2001


  Before RIPPLE, EVANS and WILLIAMS,
Circuit Judges.

  RIPPLE, Circuit Judge.  Clyde Pugh
brought an ADA discrimination claim and a
retaliatory discharge claim under 42
U.S.C. sec. 1983 against the City of
Attica, Indiana, and the Attica Board of
Works (collectively "the City")./1 The
City filed a motion for summary judgment.
The district court granted judgment to
the City. The court held that Mr. Pugh
failed to demonstrate that the City's
proffered reason for his discharge was a
pretext, as required to succeed on the
ADA claim. The court also rejected Mr.
Pugh's Section 1983 retaliatory discharge
claim because he did not establish the
requisite causal connection between his
protected First Amendment activity and
his termination. Mr. Pugh now appeals the
district court's judgment on both claims.
For the reasons set forth in the
following opinion, we affirm the judgment
of the district court.

I
BACKGROUND

A.  Facts/2

  Mr. Pugh was employed as the animal
control officer for the City of Attica

from April 1987 until his discharge on May 5, 1998. As animal control officer, Mr. Pugh was responsible for transporting animals to the Lafayette Humane Society or the veterinarian, patrolling the city for stray animals, and responding to citizen complaints regarding animals. The mayor appoints the animal control officer, who works under the police chief, the mayor, and the city clerk's office.

In a letter dated June 24, 1994, Timothy Quinn, chief of the Attica Police Department, informed Mr. Pugh that Mayor Harold R. Long and he had received reports from citizens that Mr. Pugh smelled of alcohol while on duty. The letter further directed Mr. Pugh to refrain from the use of alcohol from 8 a.m. to 4 p.m. or when on call, in accordance with the City of Attica's personnel policy manual. On January 26, 1996, the police received a citizen complaint that Mr. Pugh had been drinking and operating a city truck while performing his duties as animal control officer. In response to the complaint and at the request of Chief Quinn, Assistant Police Chief Robert Scherer located Mr. Pugh at his residence and administered a breathalyzer test. The test registered .008 percent breath alcohol content ("BAC"), which indicated consumption but not intoxication. In response to another citizen complaint on July 18, 1997, Mayor Long ordered a breathalyzer test for Mr. Pugh. The officer who tested Mr. Pugh reported a BAC of .04 percent and noted that he detected an odor of alcohol on Mr. Pugh's breath.

In the six-month interim separating the two tests, the City of Attica instituted a drug and alcohol abuse policy; on March 19, 1997, Mr. Pugh signed a form that attested to his having read and understood the policy. Under the policy, employees were prohibited from consuming alcohol while on duty, and an employee could be tested for alcohol if the city had a "reasonable suspicion" of consumption. R.30, Ex.B. An employee whose test registered the presence of alcohol could continue employment on a conditional basis by consenting to participation in certified counseling, by remaining alcohol free, and by submitting to periodic and unscheduled breathalyzer tests.

Pursuant to the policy, Mayor Long sent Mr. Pugh a letter on July 30, 1997, requiring Mr. Pugh to undergo professional alcohol counseling and to submit to a breathalyzer test each time he was on duty if he wanted to retain his position as animal control officer. Six days later, after Mr. Pugh had driven a city truck without submitting to a test, City Attorney Thomas P. O'Connor sent Mr. Pugh a letter of clarification restating the breathalyzer test requirement. Mr. Pugh subsequently began the testing. Mr. Pugh also received an alcohol assessment at Wabash Valley Hospital on September 25, 1997, after O'Connor sent him a letter, dated August 22, 1997, reminding him of his obligation to seek counseling. The counseling and breathalyzer tests lasted for approximately six weeks during August and September 1997. On March 5, 1998, after Mr. Pugh had completed the requisite counseling program, he was stopped by the police for a breathalyzer test. The city claims it stopped Mr. Pugh in response to a citizen complaint; however, there is no report of the complaint in the record. Nevertheless, none of the daily tests nor the March 5th test registered the presence of alcohol.

In late April 1998, Mr. Pugh contacted an attorney, Brenda Clapper, to discuss his belief that his rights were being violated by Attica police officers. According to Mr. Pugh, the police officers had been following him when he was off-duty after he completed the alcohol counseling. Mr. Pugh claimed that the officers parked in front of his home and stayed until he had entered the house, followed him from his home by car, and waited for him at other locations to continue following him. In her affidavit, Ms. Clapper indicated that Mr. Pugh complained about two drug tests, the required alcohol counseling, the alleged police surveillance, and mandatory breathalyzer tests administered without probable cause, both on and off duty. On April 28, 1998, Ms. Clapper contacted O'Connor to explore Mr. Pugh's claims.

About the same time that Ms. Clapper contacted O'Connor, Assistant Police Chief Robert Scherer conducted an internal investigation into allegations that Mr. Pugh had misappropriated public funds. Scherer's report states that on

April 29, 1998, Mike Marquess and Joann Tucker, officers of the Animal Welfare League, came to the Attica Police Department to discuss an incident in which Mr. Pugh allegedly had mishandled funds. According to Marquess and Tucker, Mr. Pugh had collected a twenty-dollar donation from a dog's owners on April 19, 1998, in exchange for impounding the animal. Mr. Pugh had filled out a release form that was then signed by one of the dog's owners and contained a written notation under the owner's name that the donation had been made. The release form indicated that the owners had given the dog to the City of Attica. According to Scherer's report, Mr. Pugh explained that the form was posted at the pound where people who wish to adopt a dog might see the form. When the form was found posted at the pound by Marquess and Tucker, the portion of the paper containing the donation amount had been torn off, prompting Marquess and Tucker to contact the police.

On April 30, 1998, Scherer met with the dog's owners, who confirmed the payment to Mr. Pugh and the signature on the form. One owner stated that he donated the money when the "dog catcher told him that the city would require some sort of donation to take the dog." R.40, Ex.10. Scherer then spoke with the city clerk's office, which indicated that no monies had been deposited by Mr. Pugh nor was it a policy for Mr. Pugh to collect donations.

Scherer met with Mr. Pugh on May 3, 1998, at the police department. Unsure of the conversation's outcome, Scherer read Mr. Pugh his Miranda rights. At Scherer's request, Mr. Pugh explained the events of April 19, 1998. Mr. Pugh indicated that, in response to an inquiry from the owner, he had stated that the Animal Welfare League usually asked for a donation. Mr. Pugh further explained that he had removed the bottom of the form where the donation amount was listed because, when individuals visit the pound to adopt a dog, they often see the form posted and believe that the donation amount is the price of the animal. Finally, Mr. Pugh claimed that he had intended to turn the money over to either Marquess or Tucker and had forgotten to give the twenty dollars to Tucker a few days earlier when he had seen her at the bank. In his

report, Scherer stated that Mr. Pugh was aggravated at the implication that he had mishandled the money but also agreed that the circumstances were not favorable to him. At Scherer's suggestion, Mr. Pugh then tendered the twenty dollars, for which Scherer provided Mr. Pugh a receipt.

Later, Tucker called Scherer to inform him that Mr. Pugh had visited her residence and had been visibly upset about the twenty dollars. When Scherer asked Tucker if Mr. Pugh had ever turned money in to her in the past, she replied that only once before had Mr. Pugh given her money. Over a year earlier, Mr. Pugh had collected a ten-dollar donation, and Tucker claimed that Mr. Pugh was slow in remitting it. Mr. Pugh asserted in his deposition that he collected money from animal owners approximately every two or three weeks; however, he only deposited the money with the animal league when he saw Marquess or Tucker, which could be up to three or four weeks later. Mr. Pugh also stated that neither Marquess nor Tucker ever gave him receipts for the donations. At the conclusion of his investigation, Scherer provided his report to Chief Quinn and Mayor Long.

On May 5, 1998, the Board of Works terminated Mr. Pugh after a motion was made by O'Connor, the city attorney, to discharge Mr. Pugh for misappropriation of funds. According to the city's personnel policy, the Board of Works con sists of three members, is controlled by the mayor, and has broad powers. At the time of the May 5th meeting, the Board of Works members were Mayor Long, O'Connor, and Deon (Butch) Swift.

B.  Proceedings in the District Court

Mr. Pugh brought this action against the City under the Americans with Disabilities Act ("ADA"), 42 U.S.C. sec. 12101 et seq. In his complaint, Mr. Pugh alleged that the City regarded him as being an alcoholic and that the City discriminated against him by "materially affecting and altering the terms and conditions of [his] employment," by terminating him, and by subjecting him to breathalyzer tests./3 R.1 at 1 para.para. 11, 30-31. In addition, Mr. Pugh asserted retaliatory discharge under Section 1983 based on his First Amendment

right to redress grievances with the government. Mr. Pugh alleged that the City terminated his employment because he had contacted an attorney to pursue his claim of police harassment./4 The City filed a motion for summary judgment. In its motion, the City asserted that Mr. Pugh was discharged for misappropriation of funds and not because of a perceived disability or in retaliation for protected activity./5

The district court granted summary judgment in favor of the City. On the ADA claim, the court first held that Mr. Pugh established a prima facie case of discrimination under the burden-shifting test set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), because the City perceived Mr. Pugh as an alcoholic. The City then met its burden to proffer a legitimate, nondiscriminatory reason for Mr. Pugh's discharge by claiming that Mr. Pugh had been terminated for misappropriation of funds. In support, the City provided the police incident report detailing the investigation into Mr. Pugh's alleged mishandling of a twenty-dollar donation and the minutes for the Board of Works meeting at which Mr. Pugh was terminated.

The burden then shifted back to Mr. Pugh to demonstrate that the City's proffered reason was a pretext for discrimination. In contrast to the City's support for its nondiscriminatory reason for Mr. Pugh's discharge, Mr. Pugh offered only the suspicious timing of his discharge and his own unsupported deposition testimony explaining his process for collecting and remitting money. The district court found discrepancies between Mr. Pugh's alleged practice of collecting donations over a period of years and Tucker's statement that she had received money from Mr. Pugh only once. The court also rejected Mr. Pugh's argument that the absence of an explanation for his discharge in the City's termination letter was evidence of pretext. The court held that, because Mr. Pugh did not submit evidence to suggest that the Board of Works terminated him because it perceived him as an alcoholic rather than for misappropriation of funds, he did not demonstrate pretext. Therefore, Mr. Pugh's ADA claim failed.

The district court also granted summary judgment to the City on Mr. Pugh's

Section 1983 retaliatory discharge claim. The court assumed, for the purposes of the decision, that Mr. Pugh had established that his contact with an attorney to discuss harassment claims against the City was protected conduct; however, Mr. Pugh could not establish a causal connection between his protected activity and his termination. In the court's opinion, the record established that Mr. Pugh was terminated for his alleged misappropriation of funds, and, therefore, the court held that Mr. Pugh failed to demonstrate retaliation.

## II

## DISCUSSION
### A. Standard of Review

We review a district court's grant of summary judgment de novo. See Lawson v. CSX Transp., Inc., 245 F.3d 916, 922 (7th Cir. 2001). Summary judgment is proper when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In evaluating the district court's decision, we "must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." Bellaver v. Quanex Corp., 200 F.3d 485, 491-92 (7th Cir. 2000). To avoid summary judgment, Mr. Pugh must set forth specific facts that demonstrate a genuine issue of triable fact and must produce more than a scintilla of evidence to sup port his position. See Bekker v. Humana Health Plan, Inc., 229 F.3d 662, 669 (7th Cir. 2000). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). With these standards in mind, we turn to Mr. Pugh's first claim.

### B. The ADA Discrimination Claim

Mr. Pugh contends that the City violated the ADA when it terminated his employment as animal control officer. Mr. Pugh asserts that the City discharged him based upon its perception that he was an alcoholic and not because it believed that he had misappropriated funds.

Under the ADA, an employee may present either direct or indirect evidence of employer discrimination. See Bekker, 229 F.3d at 670. When relying on indirect evidence at the summary judgment stage, as Mr. Pugh does, a plaintiff must first establish a prima facie case of discrimination within the meaning of the ADA, in accordance with the burden-shifting method developed in McDonnell Douglas. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000); Tyler v. Ispat Inland Inc., 245 F.3d 969, 972 (7th Cir. 2001); Bekker, 229 F.3d at 672.

To establish a prima facie case of discrimination, Mr. Pugh must show that (1) he is disabled within the meaning of the ADA, (2) he is qualified to perform the essential functions of his job either with or without reasonable accommodation, and (3) he suffered from an adverse employment decision because of his disability. See Bekker, 229 F.3d at 669-70. A plaintiff may show that he is disabled within the meaning of the ADA by demonstrating that he is "regarded as" having an impairment that "substantially limits one or more of [his] major life activities." 42 U.S.C. sec. 12102(2);/6 see also Bekker, 229 F.3d at 670; Wright v. Ill. Dep't of Corrections, 204 F.3d 727, 730-32 (7th Cir. 2000) (discussing the guidelines for deciding when an employee is "regarded as" having a disability).

Once Mr. Pugh has established his prima facie case, the burden shifts to the City to articulate a legitimate, nondiscriminatory reason for its adverse employment decision. See Reeves, 530 U.S. at 142-43; Tyler, 245 F.3d at 972; Bekker, 229 F.3d at 672. If the City meets its burden, the presumption of intentional discrimination disappears, and Mr. Pugh must prove, by a preponderance of the evidence, that the reason proffered by the City was a pretext for intentional discrimination. See Reeves, 530 U.S. at 143; Tyler, 245 F.3d at 972; Bekker, 229 F.3d at 672. Mr. Pugh may demonstrate pretext by offering evidence that the City's "proffered explanation is unworthy of credence." Reeves, 530 U.S. at 143 (citation omitted); Lawson, 245 F.3d at 931.

To survive a motion for summary judgment, Mr. Pugh must produce evidence that "create[s] an issue of fact as to whether the reasons offered by the [City] were sincere--in [ADA] lingo, not pretextual." Green v. Nat'l Steel Corp., Midwest Div., 197 F.3d 894, 898-99 (7th Cir. 1999) ("[ADA]" alteration in original) (citation omitted). Under the law of this circuit, Mr. Pugh must provide more than his unsupported declaration that the City was mistaken in order to defeat the City's motion for summary judgment. See id. at 899. Even if the City was incorrect in its belief, we will not contest the City's reasoning if the City acted in good faith and held an honest belief in the proffered reason for Mr. Pugh's termination. See Green, 197 F.3d at 899; Kariotis v. Navistar Int'l Trans. Corp., 131 F.3d 672, 676-77 (7th Cir. 1997). Under this framework, Mr. Pugh retains, at all times, the ultimate burden of proving intentional discrimination by the City. See Reeves, 530 U.S. at 143.

The district court addressed the first prong of the prima facie case and assumed that the remaining prongs had been satisfied. With respect to the first prong, the court specifically found that Mr. Pugh was disabled within the meaning of the ADA. Mr. Pugh was "regarded as" an alcoholic by the City in that the "record evidence more than sufficiently establishes that Mr. Pugh's employers perceived him as an alcoholic." R.52 at 9. Our view of the evidence leads us to agree with the district court. Like the district court, we shall assume that Mr. Pugh has established the remaining two prongs of the prima facie case.

The burden now shifts to the City to present a legitimate, nondiscriminatory reason for terminating Mr. Pugh. The City successfully meets its burden by contending that it discharged Mr. Pugh for the misappropriation of public funds. This decision was based on Assistant Police Chief Scherer's investigation into the allegations made by Marquess and Tucker of the Animal Welfare League. Because the City offers a legitimate, nondiscriminatory reason for discharging Mr. Pugh, the burden shifts back to Mr. Pugh to demonstrate that the City's proffered reason, the mishandling of funds, is a pretext for discriminatory

intent.

Mr. Pugh fails to show that the City's proffered reason for his discharge is unworthy of credence. It is insufficient for Mr. Pugh simply to assert that he did not misappropriate funds and that the City's belief was mistaken without offering further evidentiary support. See Green, 197 F.3d at 899. Rather, he must present evidence to create a material dispute as to the City's honest belief that he had mishandled the funds. See id. Mr. Pugh advances three arguments in an attempt to create an issue of material fact as to whether the City's belief in his misappropriation of funds was pretextual. We examine each argument in turn.

Mr. Pugh first attempts to demonstrate pretext by showing that the City's belief was mistaken because he had not misappropriated funds. Mr. Pugh argues that he solicited donations for the humane society from animal owners routinely every two to three weeks and that he turned over the funds to Marquess and Tucker. Mr. Pugh admits that he kept the donations until he saw either Marquess or Tucker and only then did he turn them in, sometimes three to four weeks after collecting the funds. However, in support of this explanation, Mr. Pugh offers no more than his own deposition testimony. Mr. Pugh argues that he should survive summary judgment because he supported his answer to the City's motion for summary judgment with designated materials as required by Local Rule 56.1. Yet the cited materials are simply his own responses in his deposition as set forth in his statement of additional material facts.

Regardless, Mr. Pugh's argument is misplaced. By arguing that he did not mishandle funds, he has not cast any doubt on the honesty of the City's belief that he had engaged in such conduct. Mr. Pugh offers no evidence to suggest that the City had additional information or knowledge, such as records from the city clerk or from the animal shelter, which would have indicated that the City did not truly believe that Mr. Pugh had misappropriated funds. Nor does Mr. Pugh offer evidence to imply that his practices were sanctioned by the City.

In contrast, the City supported its legitimate reason for terminating Mr. Pugh with documented evidence and affidavits./7 The City submitted Scherer's report of the internal investigation that he had conducted after the police were contacted by Marquess and Tucker. Marquess and Tucker contacted the police to express concern that Mr. Pugh had collected the twenty dollars from a dog owner and had not yet turned it in to either of them. When Mr. Pugh took the dog from the family and accepted the twenty-dollar donation, he also collected a document from the owners that included an owner's signature and the amount of the donation. However, when the document was posted at the pound, the portion of the document containing the donation amount was removed.

In the course of his investigation, Scherer spoke with the city clerk, who indicated that Mr. Pugh had not deposited funds, nor was it a city policy for Mr. Pugh to collect monies on behalf of the city. When Scherer met with the dog owners, he was told that Mr. Pugh had said that some kind of donation would be required in exchange for the city taking the animal. The owner also stated that he had signed the form with the twenty-dollar donation indicated under his signature. Two days later, Scherer met with Mr. Pugh. Mr. Pugh claimed that he had told the owner that the city usually asked for donations in response to an inquiry by the owner. He also explained that he had torn off the bottom portion of the form to prevent people from thinking that the price of adoption was twenty dollars. In explanation for not having turned the twenty dollars over to Tucker when he saw her, Mr. Pugh asserted that he had intended to give Tucker the money but had forgotten. Mr. Pugh then gave the twenty dollars to Scherer at Scherer's suggestion. When Tucker contacted Scherer by phone later that day, Scherer asked if Tucker ever had received funds from Mr. Pugh in the past. She replied that Mr. Pugh turned in money to her only once. Over a year earlier, Tucker had received ten dollars from Mr. Pugh, who had delayed turning in the money.

Contrary to Mr. Pugh's claim, the district court did not weigh the credibility of Mr. Pugh's deposition when

it (1) labeled the deposition "self-serving" and (2) noted the discrepancy between Mr. Pugh's assertion that he had collected and remitted money regularly and Tucker's statement that she had received money from Mr. Pugh on only one occasion. The district court appropriately evaluated the evidence offered by both parties. The City was entitled to rely on the allegations made by Tucker and Marquess as well as the results of Scherer's investigative report in its decision to terminate Mr. Pugh for mishandling public funds. As a result, the court determined that Mr. Pugh failed to submit evidence from which a reasonable jury could conclude that he was terminated for anything other than misappropriation of funds.

Mr. Pugh's second claim, in his attempt to demonstrate pretext, is that the timing of his discharge was suspicious. The Board of Works voted to terminate Mr. Pugh one week after Mr. Pugh's attorney contacted City Attorney O'Connor to discuss Mr. Pugh's concerns with alleged police harassment.

Suspicious timing does constitute circumstantial, or indirect, evidence to support a claim of discrimination. See Foster v. Arthur Anderson, LLP, 168 F.3d 1029, 1034 (7th Cir. 1999). A time lapse of one week may be sufficient, in combination with additional evidence, to demonstrate pretext. See King v. Preferred Technical Group, 166 F.3d 887, 894 (7th Cir. 1999) (holding that the lapse of one day, in combination with the fact-specific affidavits of the plaintiff and her husband, were sufficient to "cast doubt" on the reasons offered by the employer for the plaintiff's termination under the Family and Medical Leave Act). However, timing alone does not create a genuine issue as to pretext if the plaintiff is unable to prove, through other circumstantial evidence, that he was terminated for a reason other than that proffered by the employer. See Foster, 168 F.3d at 1034.

The suspicious timing of Mr. Pugh's discharge is only sufficient to demonstrate a showing of pretext if Mr. Pugh also presents other evidence that casts doubt on the veracity of the City's belief that Mr. Pugh had mishandled funds. In contrast to the plaintiff in

King, who supplemented the claim of suspicious timing with fact-filled affidavits and testimony from her husband and herself, see King, 166 F.3d at 894, Mr. Pugh offers no more than a general explanation in his own deposition. Even if the City's action appears precipitous under the circumstances, we are not in a position to question the wisdom of a decision that was honestly made. See Green, 197 F.3d at 899 ("[R]egardless of whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief, we will not second-guess its decisions."); Kariotis, 131 F.3d at 677. Although Mr. Pugh's deposition avers that the City was mistaken in its belief, the deposition does not directly question the credibility of that belief as required to demonstrate pretext. Mr. Pugh has not met the evidentiary burden necessary to rely on the suspicious timing as evidence of pretext.

Mr. Pugh's third claim is that the City did not come forward with the allegations of misappropriation of funds until he filed this suit. Mr. Pugh believes that this claim is supported by his termination letter from Mayor Long, which did not state a reason for his discharge, and Scherer's inability to tell Mr. Pugh the reason for his termination when confronted by Mr. Pugh. This claim is without merit. The Board's decision to discharge Mr. Pugh for misappropriation of funds was formulated prior to the suit, as evidenced by the minutes of the Board's meeting and Scherer's investigation report.

For all of the reasons stated above, Mr. Pugh has failed to demonstrate that the City's legitimate, nondiscriminatory explanation for discharging him was unworthy of credence and thus pretextual. We hold that the district court's grant of summary judgment in favor of the City on the ADA discrimination claim was proper.

C.  The Section 1983 Retaliatory Discharge Claim

Mr. Pugh asserts that he exercised his First Amendment right to redress grievances with the City when he contacted his attorney to discuss alleged police harassment, the breathalyzer tests, and

the substance abuse counseling. Mr. Pugh further contends that the City retaliated against him for this protected activity in violation of Section 1983 when it terminated him one week after his attorney contacted the city attorney to discuss his grievances.

As our cases acknowledge,/8 the Supreme Court's decision in Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287 (1977), sets forth the appropriate analysis for evaluating a claim of retaliatory discharge based on the First Amendment. In Mt. Healthy, the Supreme Court held that a plaintiff claiming such an injury must show that his conduct was constitutionally protected and that the conduct was a "substantial factor" or a "motivating factor" for the discharge. Id. (internal quotation marks omitted) (citing Village of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 270-71 n.21 (1977)). If the plaintiff succeeds in shouldering that burden, the defendant must then establish that it would have reached the same decision "even in the absence of the protected conduct." Id.

We assume for the purposes of appeal, as the district court did, that Mr. Pugh's contact with his attorney was protected conduct. Therefore, Mr. Pugh must demonstrate that his conversation with his attorney was a substantial or motivating factor in the City's decision to dismiss him. Mr. Pugh has offered no evidence to suggest that the City terminated him in retaliation for his having consulted with his attorney. The timing of the action, without more, is insufficient to establish the protected activity as a motivating factor. Cf. Contreras v. Suncast Corp., 237 F.3d 756, 765 (7th Cir. 2001) (holding that evidence of timing, absent other evidence of discrimination, is insufficient to survive a motion for summary judgment under an ADA or a Title VII retaliation analysis). The evidence of record-- theminutes of the Board of Works meeting and the internal investigation report compiled by Scherer--establishes that the City discharged Mr. Pugh for misappropriation of funds. Therefore, we hold that the district court properly granted the City's motion for summary judgment on Mr. Pugh's Section 1983 retaliatory discharge claim./9

Conclusion

   For the reasons set forth in this
opinion, we affirm the judgment of the
district court.

AFFIRMED

FOOTNOTES

/1 Mr. Pugh also brought these claims against the
Attica Police Department and various officials of
the City of Attica, individually and in their
official capacities. The district court dismissed
the claims against these parties, and Mr. Pugh
does not appeal those dismissals.

/2 In its appellate brief, the City argues that Mr.
Pugh's statement of facts should be stricken for
violations of Circuit Rule 28(c). The rule states
that the "statement of facts required by Fed. R.
App. P. 28(a)(7) shall be a fair summary without
argument or comment. No fact shall be stated in
this part of the brief unless it is supported by
a reference to the page or pages of the record or
the appendix where that fact appears." 7th Cir.
R. 28(c). Although Mr. Pugh technically violated
the rule, the omissions did not so impede our
consideration of the case as to warrant striking
the statement.

/3 Additionally, Mr. Pugh originally predicated his
ADA claim on the impairments of diabetes and an
earlier tracheotomy. Mr. Pugh abandoned the
alternate claims by failing to address them in
his response brief to the City's motion for
summary judgment.

/4 Mr. Pugh also brought Section 1983 claims based
on the Fourth and Fourteenth Amendments but
subsequently abandoned both claims.

/5 Mr. Pugh subsequently filed a motion to strike
portions of the City's statement of material
facts, which the district court denied. See infra
note 7.

/6 42 U.S.C. sec. 12102(2) provides in full:

The term "disability" means, with respect to an
individual--

(A) a physical or mental impairment that sub-
stantially limits one or more of the major life
activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

/7 Mr. Pugh moved to strike those portions of the City's statement of material facts that included City Attorney O'Connor's response to an interrogatory, which referenced Scherer's investigation report. Mr. Pugh contends these facts are hearsay within hearsay. The district court properly denied Mr. Pugh's motion to strike.

First, Scherer's report does not constitute hearsay because it is not offered to prove the truth of the matter asserted--that Mr. Pugh actually misappropriated funds. See United States v. Linwood, 142 F.3d 418, 425 (7th Cir. 1998) (citation omitted). The report is offered to demonstrate why the City honestly believed Mr. Pugh had misappropriated funds. Second, O'Connor's answers to the interrogatories were not hearsay because the City had designated O'Connor to testify to matters known or reasonably available to the City. See Fed. R. Civ. P. 30(b)(6) (allowing an organization to designate a person to testify on its behalf, who shall testify as to "matters known or reasonably available to the organization").

/8 See Thomsen v. Romeis, 198 F.3d 1022, 1027 (7th Cir. 2000); Johnson v. Univ. of Wisconsin-Eau Claire, 70 F.3d 469, 482 (7th Cir. 1995); Button v. Harden, 814 F.2d 382, 383 (7th Cir. 1987).

/9 It appears that the district court relied on the test for an ADA retaliatory discharge claim rather than for retaliatory discharge under Section 1983. Although Mr. Pugh brought his claim under Section 1983, the tests are similar, and his retaliation claim could have been brought under the ADA. Claims of retaliation under the ADA, like those brought under Title VII, employ the burden-shifting method for indirect evidence. The plaintiff must first establish a prima facie case of retaliation by proving (1) that he engaged in statutorily protected activity, (2) that he suffered an adverse employment action, and (3) that there is a causal connection between the two events. See Contreras v. Suncast Corp., 237 F.3d 756, 765 (7th Cir. 2001).

Mr. Pugh relies, in part, on this test for his Section 1983 retaliation claim; he contends that he has established a prima facie inference of retaliation and that the burden should shift to the City to establish an affirmative defense. To make the prima facie inference, he argues, he must show only that the protected activity and his termination were not "wholly unrelated." Appellant's Br. at 15. However, the only factor to which he refers in attempting to establish the requisite relatedness is the timing of his discharge. We have made clear that this factor, without more, is insufficient to establish the

defendant's burden. In Contreras, this court held that "absent other evidence of retaliation, a temporal relation is insufficient evidence to survive summary judgment" on a Title VII or ADA retaliation claim. Contreras, 237 F.3d at 765 (citation omitted). Therefore, Mr. Pugh could not establish a prima facie case of retaliation under the ADA.