Nicole D'AGOSTINO and Chelsea Schneider, Individually, and on Behalf of All Others Similarly Situated, Plaintiffs,

v.

#7 ZIMMIE'S, INC., d/b/a the Original Pancake House, Lisa Laroche–Sczurek, and Steve Sczurek, Defendants.

No. 12 CV 9162

United States District Court,
N.D. Illinois, Eastern Division.

Signed December 29, 2014

James B. Zouras, Ryan F. Stephan, Andrew C. Ficzko, Stephan Zouras, LLP, Chicago, IL, for Plaintiffs.

James Brandon Hiller, James H. Ryan, Robert Daniel Connealy, Gordon & Rees, LLP, Chicago, IL, for Defendants.

## MEMORANDUM OPINION AND ORDER

JAMES B. ZAGEL, United States District Judge

Plaintiffs Nicole D'Agostino and Chelsea Schneider ("Plaintiffs") filed a complaint against Defendants # 7 Zimmie's, Inc., d/b/a The Original Pancake House, Lisa Laroche–Sczurek, and Steve Sczurek ("Defendants") alleging violations of various provisions of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.* ("IMWL"), and the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 *et seq.* ("IWPCA"). Plaintiffs and Defendants filed cross motions for summary judgment. For the following reasons, summary judgment is granted in favor of Defendants.

## I. FACTUAL BACKGROUND

### A. Parties and Background

1. Defendant # 7 Zimmie's, Inc. is a restaurant business, originally incorporated in April 27, 1976.

2. Defendants Steve Sczurek and Lisa LaRoche–Sczurek purchased Zimmie's together on January 1, 2003 and have owned the restaurant continuously since that time.

3. Zimmie's managers during the time of Plaintiffs' employment were Craig Arrigoni, Silvia Zermeno, and Chantelle Riha, as well as Don Neakarse and Carl McNair.

4. Zimmie's is located at 22 East Bellevue Place, Chicago, Illinois 60611 and has done business as the "Original Pancake House" since January 1, 2003.

5. Steve Sczurek and Lisa LaRoche–Sczurek—and no one else—have the authority to establish wage and hour policies for servers at Zimmie's.

6. Plaintiff, Nicole D'Agostino ("D'Agostino"), worked at Zimmie's as a server and as a host from Spring 2012 to November 2012.

7. Plaintiff, Chelsea Schneider ("Schneider"), worked at Zimmie's as a server from March 19, 2012 to January 2013.

### B. Jurisdiction and Venue

8. This Court has jurisdiction of this dispute which presents federal questions under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (2006).

9. Federal question jurisdiction is proper pursuant to 28 U.S.C. § 1331.

10. Jurisdiction for Plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

11. Venue is proper pursuant to 28 U.S.C. § 1391(b).

### C. Zimmie's Payment Plan for Servers

12. Zimmie's servers[1] earn $4.95 per hour in the form of a cash wage of $4.85 per hour and 10 cents in the form of meals; 10 cents of the $4.95 an hour is used to provide for a meal credit because Zimmie's offers free meals to employees as part of their wages. Assuming an eight hour no overtime shift, the board or food wage for this kind of shift comes to 80 cents. Zimmie's also provides discounted meals not linked to the dime deduction. Owners and other employees, whether or not hourly employees on the dime meal credit deduction, may consume free meals.

13. The meal credit is not unique to Zimmie's servers as it provides all of its hourly employees—which includes servers, hosts, bussers, dishwashers, and cooks—meals in exchange for an hourly 10 cent meal credit deduction.

14. The 10 cent meal credit has been in place since 1976, and it has not changed since then.

15. Defendants continued the wage and hour policies that were in place at the time they purchased Zimmie's in 2003.

16. Zimmie's informs its server employees of its intention to take a tip credit in a written form as required by federal law.

17. Servers do not receive written notice of the meal credit deduction.

18. Zimmie's allows employees to opt out of the meal credit if they want to because Zimmie's loses money providing the benefit; that said, no employee has ever asked to drop out of the meal credit since the Sczureks purchased the restaurant. The servers are not advised specifically of the option to decline the meal credit. Plaintiffs' counsel contends that "Defendants assume no server would ever want to decline it."[2]

19. Both Plaintiffs received notice of their cash wage and notice of Zimmie's tip credit and tip pooling policies.

20. Zimmie's keeps a current version of a Department of Labor poster in its kitchen area.

---

**1.** Employees, like the servers at Zimmie's, who receive tips for their work usually are paid an hourly wage rate less than those whose work does not customarily lead to gratuities. Federal and state laws explicitly provide for such a practice.

**2.** I have no information on the question of common usage of food wages in current establishments. I infer from the absence of a large number of cases litigated over this issue that the practice may not be in broad use. There was, I recall, wide news coverage surrounding the decision to close the restaurant, Berghoff. The waiters at Berghoff did eat meals and regretted that they no longer would get free meals. Several expressed the view that Berghoff would reopen after a period of closure and that the new wait staff would not get free meals and other benefits.

21. Both Plaintiffs acknowledge or do not dispute that they earned $30 or more per month in tips.

22. Exhibit 6 of Mr. Sczurek's deposition is a paycheck stub issued by Zimmie's to Chelsea Schneider, which contains a line item for the meal credit indicating that $5.30 was deducted in exchange for meals for this pay period.

23. When the $5.30 meal credit deduction is added back into the "REGULAR" cash wages line of $257.20 and divided by Schneider's hours worked for the pay period, the paycheck stub shows that Zimmie's paid her $4.95 per hour in cash and meals ($257.20 + 5.30 = $262.50/53.03 hours worked = $4.95).

24. The paystubs Schneider brought to her deposition were the same format as the paystubs she received during her employment at Zimmie's, and the paystub format did not change during her employment at Zimmie's.

25. Zimmie's meal credit deduction is a flat, uniform, hourly 10 cent deduction; Zimmie's tracks and maintains the information necessary to determine an individual employee's meal deductions on a weekly basis at the payroll level and daily basis at the managerial level. It is true that deductions were not necessarily calculated each week but the information in the employer's records permitted the employer to retroactively calculate costs and benefits on a weekly basis. The data would not allow reconstruction of the specific kind of food, and the actual cost meal by meal.

26. On a daily basis and at the end of every shift, time entries are reviewed by the manager who prints a time summary report so he or she can review the punches of each employee for the day.

27. Zimmie's produces a weekly payroll report that is usually reviewed by Chris Byrne, Mr. Sczurek's office manager, to confirm the employees' punch times and that servers have claimed their tips.

28. During the server training process, a more senior server walks the new hires through the training process.

29. A senior server named Brooke Bogner assisted both Plaintiffs during new server training at Zimmie's.

30. Schneider recognizes Exhibit 7 as the Employee Meals sheet she was shown when she was hired on March 19, 2012, and she does not dispute the contents of the Employee Meals sheet.

31. The Employee Meals sheet contains all menu items that employees can order at a discounted rate and all those items that are full price.

32. At the bottom of the Employee Meals document it states that all other menu items not listed here are available at no extra charge for employee meals, because—outside of the premium items listed—Zimmie's employees were allowed to eat free food and drink on their shifts.

33. D'Agostino saw the same Employee Meals document during her employment at Zimmie's.

34. Zimmie's uses an electronic computer system known as a point of sale ("POS") system that allows servers to enter food orders, process the customers' checks, and punch in and out of their shifts.

35. Servers are given an individualized, three digit server number that allows them to log into the POS system, which they use to input customer orders.

36. All Zimmie's employees (and owners) can gain access to the POS system by inputting the employee meal number which is "444" to order an employee meal.

37. Zimmie's required that all food items ordered by employees had to be entered in the POS system using the employee meal code of 444.

38. POS terminals are connected to printers that print out two copies of the order receipt: one for the customer or employee and one for the kitchen.

39. As is the case with a meal ordered by a customer, when an employee meal is ordered the employee must take his or her meal receipt to the kitchen for it to be prepared. Zimmie's does not maintain a printer in the kitchen nor does it maintain a display or monitor that projects orders directly to the kitchen. Two receipts are printed, and one receipt must be manually transported to the kitchen in order for the meal order to be prepared.

40. Schneider entered employee meals into the POS system that she consumed, including eggs and pancakes, and Schneider ate meals provided by Zimmie's on three out of every five shifts she worked as a server.

41. D'Agostino ate a meal provided by Zimmie's on approximately 50 percent of her shifts, and she believes that she has tried everything on the menu.

## D. Plaintiffs' Contentions Regarding the Meal Credit

42. Schneider contends that Zimmie's meal credit was never explained to her, but rather Schneider learned of it in July 2012 by examining her paycheck stubs.

43. In July 2012, Schneider approached Cynthia Sliwa, a server co-worker at Zimmie's, about the meal credit, and Sliwa told Schneider that Zimmie's has always done that.

44. Several days after Schneider's conversation with Sliwa, Schneider asked Manager Craig Arrigoni about the meal credit, which is the first time Schneider discussed the meal credit with a Zimmie's manager.

45. Schneider approached Arrigoni with her check stub, and he told her that 10 cents per hour was deducted for meals whether they were eaten or not. (Ex. 3, 86:10–14)

46. When Schneider asked Arrigoni why Zimmie's has a meal credit policy, he responded that, "I don't know. It is what it is."

47. After her discussion with Arrigoni, Schneider did not voice her concerns about the meal credit to any other Zimmie's manager.

48. Schneider discussed an issue unrelated to the meal credit with Lisa LaRoche–Sczurek face-to-face in September 2012 at Zimmie's around 1 or 2 p.m.

49. D'Agostino asserts that she was never told that Zimmie's deducted 10 cents from her hourly wage in exchange for meals and beverages until a co-worker named Alicia pointed it out to D'Agostino on a paystub in late October 2012.

50. D'Agostino cannot recall ever having any other conversations with anyone affiliated with Zimmie's about the hourly 10 cent meal credit deduction after learning about it from Alicia.

51. D'Agostino believes that Zimmie's meal credit is improper because she did not receive notice of it and was not allowed to opt out of it, but D'Agostino never went to any Zimmie's employee requesting to opt out of the meal credit.[3]

---

**3.** Plaintiffs' counsel objects to inclusion of this assertion of what one plaintiff believed and her explanation of why she did not opt out of the meal credit. Her state of mind is not the equivalent of a legal conclusion about why she did or did not do something. She was not offering a legal conclusion but rather her own reasons for why she did or did not take certain actions. Plaintiff's counsel misconstrues the statement as expressing legal views but the non-lawyer who uttered them is not offering a legal conclusion.

### E. Cost Analysis of Zimmie's Meal Credit

52. Following the filing of this lawsuit, Zimmie's conducted a financial analysis to determine the value of the employee meals Zimmie's provided to its employees as compared to the amount of the meal credit deductions Zimmie's collected from its employees.

53. Mr. Sczurek conducted an analysis of Zimmie's compensation reports and employee order entry data entered into the POS system under the "444" user code to determine Zimmie's cost to provide its hourly employees meals under the meal credit versus how much meal credit cash it took in as part of payroll. While the "444" data included free meals provided to non-hourly paid employees so that the exact amount of funds spent for hourly employee meals is not known, the number of hourly employees significantly exceeds the number of others who could use the free meal system so it is not credibly disputed that the far larger share of free meals and their cost were provided to hourly workers.

54. From November 2009 to October 2010, Zimmie's spent $15,088.10 (including cost of food and preparation) providing free employee meals while it collected $4,264.87 in meal credit deductions from November 9, 2009 to November 14, 2010, meaning it lost a net $10,823.23 in providing employee (and owner) meals from roughly November 2009 to November 2010.

55. From November 2010 to October 2011, Zimmie's cost for providing the free menu items to its employees was $15,017.36, while it collected $5,089.09 in meal credit deductions from November 28, 2010 to November 13, 2011, meaning it lost $9,928.27 providing employee meals from roughly November 2010 to November 2011.

56. From November 2011 to October 2012, Zimmie's cost for providing the free menu items to its employees was $18,227.53, while it collected $5,093.37 in meal credit deductions from November 27, 2011 to November 11, 2012, meaning Zimmie's lost $13,134.16 providing employee meals from roughly November 2011 to November 2012.

57. Schneider has no information or knowledge regarding Zimmie's cost to provide meals to its employees.

58. Zimmie's spends more providing employee meals than it collects in meal credit deductions, but Zimmie's believes its program leads to improved employee morale, employee loyalty, employee punctuality, and less employee turnover in exchange for the meal credit.

59. Zimmie's owners do not want to recoup their losses, because they are satisfied with the program the way it currently exists.

### F. Zimmie's Discounted Meals Are Separate from the Meal Credit

60. Zimmie's also provides its employees discounted menu items that can be ordered under the "444" code.

61. The POS system differentiates between the free items and discounted items when they are rung in to the system and lists the price associated with the item or indicates that it is free.

62. The discounted meals and the meal credit are different programs because the discounted meals are not linked to any payroll deduction.

63. The discounted meals are separate and independent charges, similar to if a Zimmie's employee decided to buy a meal at McDonald's or Subway.

64. Although discounted meals are entered under the "444" user code, the costs of those menu items were not included in the meal credit cost analysis performed by Mr. Sczurek because Mr. Sczurek could

exclude them from the free employee meals data.

### G. Plaintiffs' Other Allegations

65. Plaintiffs' Amended Complaint, filed on November 15, 2012, contains allegations that Zimmie's committed several violations of the FLSA and Illinois law, including administering an improper tip pool, improper claiming of tip credit, compelling employees to work off the clock, and failure to pay overtime wages. These claims have fallen away.

66. Plaintiffs now simply claim that Zimmie's failed to pay them appropriately by its use of the 10 cents collected for the meal credit program.

67. Zimmie's POS system has an internal system that starts paying at an overtime rate of pay when an employee works over 40 hours in a week.

68. Zimmie's did not fail to pay Plaintiffs overtime.

69. Zimmie's did not force Plaintiffs to work off the clock.

70. Schneider has no evidence to dispute that the hours worked indicated on her compensation report are accurate and correspond to her punch record.

71. D'Agostino does not dispute that Exhibit 5 of her deposition is a compensation report based on her punch record and was generated by Zimmie's.

72. D'Agostino does not know how her compensation report was generated, but she does not dispute the accuracy of the data contained in the report.

73. Plaintiffs do not claim that Zimmie's wrongfully administered the tip pool for bussers.

### II. PRELIMINARY MATTER

■ Plaintiffs offer Statement 26 as evidence that Zimmie's employed at least one employee who never consumed free food. The basis for this claim is an affidavit of another server who was not identified as a witness until the affidavit was included in Plaintiffs' summary judgment motion. If true, this might reflect on the value of the meal credit and allow Plaintiffs to argue that the meal credit was not a value for servers but rather a dime an hour rip-off of servers who don't ever eat the free food.

Be that as it may, this litigation had been ongoing for nearly two years before the affidavit surfaced and its use now is unfair to Defendants and, perhaps more importantly, to the litigation process. If this affidavit is important, the delay in its discovery and disclosure prejudices all litigants. Disclosure of arguably important evidence made early in the case will usually shorten the period of litigation and its attendant costs. If this affidavit from a former server was timely and significant then litigation costs will often be avoided and resolution of the case will occur earlier in the litigation (by settlement and abandonment of the case). Plaintiffs do not claim that the material in the affidavit was not discoverable or unavailable until recently. Consequently, the affidavit will not be admitted. In any case, there is agreement that Defendant employed hourly employees, including twelve servers, on average, managers, hosts, supervisors, and kitchen staff (e.g., cooks, dishwashers) and that all these hourly employees, as well as non-hourly persons (i.e., managers, supervisors, and owners), were eligible to receive free food.

### III. LEGAL STANDARD

#### A. Standard of Review for Summary Judgment

■ Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law." Fed. R. Civ. P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.*, 259 F.3d 619, 625 (7th Cir.2001). The Court's "function is not to weigh the evidence but merely to determine if there is a genuine issue for trial." *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir.2002).

▪ Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts demonstrating that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts" in order to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir.2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)). A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir.2000). I consider the record in the light most favorable to the nonmoving party, and draw all reasonable inferences in the nonmoving party's favor. *Lesch v. Crown Cork & Seal Co.*, 282 F.3d 467, 471 (7th Cir.2002).

## IV. DISCUSSION

A. Illinois Minimum Wage Law ("IMWL") and Fair Labor Standards Act ("FLSA")

Though there is no valid dispute over the allegations of material fact—namely,

that Defendants deducted 10 cents per hour from certain hourly workers in exchange for the benefit of a meal credit—there is a fairly fierce argument over the legal significance of the facts, namely, whether the actions of Defendants are in violation of law. Plaintiffs ground their case on the governing state law, the Illinois Minimum Wage Law ("IMWL") which states that an employer can only take a meal credit "when furnished by the employer for meals ... actually used by the employee." 820 ILCS 105/3(b). In short, the servers who eat furnished meals enable the employer to take a meal credit. Though the state law does not set an absolute minimum number of meals that must be consumed on a week to week basis for the restaurant to take the credit, it is arguable whether one server who chooses never to consume a meal or beverage disables the employer from taking the dime meal credit with respect to that server. To that end, Plaintiffs sought to prove that there was such an employee, but the effort came too late in the litigation. Had that employee's allegation been proven, then I might have had to decide whether the existence of one or more non-eaters allows non-eaters to opt out while all others remain.

Because the IMWL does not, itself, clearly define the duties of the employer, the Director of Labor[4] issued administrative rules in the Illinois Administrative Code. 56 Ill. Admin. Code § 210.200 (a) and (b). The Code adds the following language about the meal credit:

> [t]he employee must receive the meals ... for which he or she is charged, and it is also essential that his/her acceptance thereof be voluntary and uncoerced. It is not sufficient that the

---

4. The statute refers to the "Director" means the Director of the Department of Labor. The correct title is "Director of Labor".

meals ... be furnished by an employer to justify the charge. It is necessary that the meals ... are furnished regularly by the employer to his employees in the same or similar ... enterprise in the same or similar communities....The employer may charge the employee the reasonable cost to the employer of furnishing meals ... which cost does not include profit to the employer ...

56 Ill. Admin. Code § 210.200 (a) and (b).

██ Plaintiffs lean heavily on the above Illinois regulation covering meals and lodging. While the Code provisions can clarify statutory law, it cannot, however, broaden or make new law beyond that in the statute. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Thus the Code is the language of aspiration, not regulation.

██ State courts have not fully interpreted the IMWL, and so, neither side has claimed that precedent controls the result. When a case of first impression arises under the IMWL, state court practice is to consider the federal case law construing FLSA decisions for guidance on similar state law issues. *Lewis v. Giordano's Enters.,* 397 Ill.App.3d 581, 592, 336 Ill.Dec. 884, 921 N.E.2d 740 (1st Dist.2009). The Seventh Circuit, however, has also not ruled directly on whether a meal credit, such as Defendants', is permissible under the FLSA.

The Sixth Circuit touched on certain aspects of a meal credit plan in *Herman v. Collis Foods, Inc.* 176 F.3d 912 (6th Cir. 1999). There, Collis Foods operated around five dozen Waffle House restaurants in four states. It employed about 1,200 hourly paid workers, most of whom were cooks or servers in the meal credit plan. The Sixth Circuit held that the Secretary of Labor's rule that the cost of meals be deducted individually based on what each employee consumed was invalid

because it effectively created a new requirement that the program be a "voluntary and uncoerced" exercise—a requirement the court had found the Secretary was unauthorized to make under the FLSA. What remained was the issue of compliance with the very clear requirement that the employer make no profit from the program. Resolving the question of whether the employer gained a profit from its meal credit program took a good deal of time, an outside expert, and several calculations of cost of representative food items. The district court ultimately concluded, based on its holding that a reasonable estimate was the standard for adjudicating the presence or absence of profitability of a meal-credit program, that the operator did not profit and that the requirements of the FLSA regarding employees' meal credits were not violated.

Because the Sixth Circuit did not, however, directly address a key issue in this case—what records were required to calculate profitability—this is a case of first impression.

### B. "Voluntary and uncoerced" Participation is Not Required by Plaintiffs

██ The Illinois statute itself states that employer-provided meals are wages "when furnished by the employer ... and actually used by the employee." The requirement that furnished meals be "actually used by the employee" means, based on a commonsense interpretation, that the meal must be presented by a menu, and then usually, in part or in whole, consumed. I use the word "usually" because an employee may, from time to time, lose appetite or become ill or start a diet. I do not read the law to require that meals be presented and consumed every day by every eligible employee. The funding for the

meals is the same for all hourly employees, which meals are consumed is the prerogative of the employee. This I find is a reasonable construction of rule and regulation. Defendants must be prepared, every day, to provide a meal to hourly employees who work that day. This is a guarantee that the dimes collected under the meal program are available for the economic benefit of the employees and not for the owners and operators.

■ State administrators created and executed regulations in the Code, like those of the federal government, which required employee acceptance of meals to be "voluntary and uncoerced." Through this provision, the Code attempted to broaden the statute by requiring that the restaurant employer (1) ensure that employees receive the meals for which the employee is charged; (2) provide meals on a regular basis; and (3) guarantee that the meals are accepted by the employee voluntarily, without coercion. The administrators, however, abandoned this requirement after many federal courts found that the rule was not properly read into the statute. While it may have been wiser for Defendants to have given notice that exemption from the meals program could be possible to those servers who wanted out of the meals program—if for no reason other than to avoid the legal costs of this litigation for both sides—I find in the law no specific requirement that servers need to be informed that they could opt out of the meals program.

In any case, there was no evidence of involuntary action or coercion. An affirmative statement by the restaurant owner is not essential to a showing of absence of coercion or the explicit server's mention of a voluntary lunch. Voluntary conduct can be inferred from the nature of action and circumstances where it occurs. This kind of inference is, and has been for centuries, a common event in litigation. The meal program began in 1976 and is still pegged at a dime an hour. Employees are informed, in writing, of the tip credit. The tip credit appears on paycheck stubs. There was significant use of the free meal program for many years by servers. The system of free food was in existence for well above 35 years before there is evidence of two servers raising questions about the meal credit. I infer that voluntary participation was commonplace. Plaintiff Chelsea Schneider worked at Zimmie's from March 2012 to January 2013 and ate the free meal on three of every five shifts that she worked. Nicole D'Agostino (employed for six months in 2012) ate meals about 50% of her shifts. Schneider went to see one manager and talked to another server. Both told her that Zimmie's has always done that or simply said, it is what it is. D'Agostino did not raise any issue with management. The repeated participation of both servers and that of operation of the free meal is consistent only with voluntary participation. It might be true that government regulators could require signed affidavits from employees declaring they wish to participate in the free meal program and declaring that no one coerced them into the free meal program. But they have not done this and wisely so.

There is no evidence of involuntary acceptance of meals. There was acceptance of the meal credit procedure. There was nothing inherent in the offer of employment that was coercive; it was an offer of employment, a condition of which was payment by Zimmie's of a dime an hour to provide meals. That condition was accepted by servers for periods that ran for decades. The program left it up to the individual employee whether to order and eat a meal. The employee had the right to have a meal every day if that employee so chose, but there is nothing about the structure of the program that requires an em-

ployee to eat a meal at every opportunity. It is significant that the food wages practice of Zimmie's did not create an atmosphere of coercion. Evidence of coercion cannot be found here.

### C. Meals Program was not Profitable for Defendants

A principle limitation of the meals program is that while employers are allowed to charge a reasonable cost of furnishing meals, the employer's meal credit "[can]not include a profit to the employer." § 210.200(b). The prohibition against profit for furnishing meals seems inherent in the statutory concept of a meal credit that it is worth more than for what it was paid. There is no dispute that meals are offered regularly and the reasonableness of the cost is not seriously challenged (about 80 cents for eight hours of work). Ordering and eating a meal seems, on its face, a voluntary act and what may constitute coercion is utterly undefined.

Defendants did calculate the financial results of the program. For the fiscal years 2010, 2011, and 2012 (from November to October), Defendants lost approximately $11,000. To this, Plaintiffs object because the meals were also consumed by non-hourly employees. This conclusion is not reached by an independent analysis by Plaintiffs. It is probably true that the average amounts are overstated but it is reasonably certain that the number of meals served to salaried employees who do not surrender dimes is too small to allow an inference that Defendants meal program was anything other than a substantial cost to Defendants.

The statute could have (but did not) require specific, written acceptance or rejection of the meals program or require the employer to advise servers that the server could avoid application of the dime an hour charge for participation in the meals program. Under the FLSA, De-

fendants were required to track each employee's wage deduction on a weekly and per shift basis. Under its ordinary payroll reporting, all hours worked by hourly employees are tracked and this permits Defendants to calculate the meal credit deduction which also appears on the employee's paystubs. So, each hourly employee has a record of how many dimes from their work was paid into the meal program for their use. Significantly, no server sought exemption, no server complained, and, except for one or two latecomers to this case, no server abstained from the meals which were listed in a meals sheet. In this case there is no doubt that meals were provided for and actually used by employees, including Plaintiffs. The bottom line was that "wages [were] compensation due to an employee by reason of his employment, including allowances ... when furnished by the employer, for meals ... actually used by the employee." Under these circumstances, the data provided by Zimmie's makes it clear that the meal credit was used by servers and Zimmie's made no profit from its use.

Plaintiffs argue that Defendant's goals (gaining the loyalty and satisfaction of its hourly staff) could have been achieved if the program was made a bit more complex by first calculating for each employee the amount of food served and/or eaten and the dimes paid in to cover the cost of the meals and second, requiring monthly filings. Implicit in Plaintiffs' view is the faulty assumption that a particular form of record keeping of the meal credit program is required, seemingly in the same sort of way that income and deductions are reported to the federal and state governments. Such a record keeping requirement would make it more costly, potentially prohibitively so, to continue these programs; in any case, neither statute nor regulation requires anything more than

current compliance with an existing, long standing practice. Neither federal nor state law requires that Zimmie's provides an annual, monthly or weekly filing of an accounting of the meal credit program. The Secretary of Labor can investigate the operation of the program and may require the employer to file a detailed report, but it need not do so as a matter of course. There is, so far as I can discern, no standard form for such a report and, consequently, no specific form of record keeping required of meal credit programs.

## V. CONCLUSION

Defendants' motion for summary judgment is granted and the motion for summary judgment filed by Plaintiffs is denied.