Cynthia GREEN, Plaintiff–Appellant,

v.

NATIONAL STEEL CORPORATION,
MIDWEST DIVISION, Defendant–
Appellee.

No. 99–1057.

United States Court of Appeals,
Seventh Circuit.

Argued May 18, 1999.

Decided Dec. 10, 1999.

Terry R. Boesch (argued), Valparaiso, IN, for Plaintiff–Appellant.

F. Joseph Jaskowiak (argued), Hoeppner, Wagner & Evans, Valparaiso, IN, for Defendant–Appellee.

Before COFFEY, KANNE and WOOD, Circuit Judges.

COFFEY, Circuit Judge.

The plaintiff-appellant, Cynthia Green ("Green"), brought this action in the United States District Court for the Northern District of Indiana against the defendant-appellee, National Steel Corporation, Midwest Division ("National"), alleging a violation of the Americans with Disabilities Act, ("ADA"), 42 U.S.C. § 12111, *et seq.* Green claimed that National terminated her employment because of her alleged disability.[1]

The parties consented to the jurisdiction of the United States Magistrate Judge and the case was transferred to Magistrate Judge Theresa L. Springmann. At the close of discovery, National moved for summary judgment. Shortly before a trial was to commence, the Magistrate granted National's motion for summary judgment during a telephonic status conference with all interested parties. The court issued its written Memorandum and Order shortly thereafter. Green appeals.

## I.  BACKGROUND

Cynthia Green was in a serious car accident in October of 1991. As a result of injuries suffered in the accident, Green is no longer able to climb, lift anything over ten pounds, perform housework, read "a lot," walk any significant distances, bend, shop, have marital relations, or participate in activities with her children. She also becomes confused easily, suffers from photophobia[2] and difficulty with her peripheral vision, experiences anxiety or "panic" attacks and severe headaches, suffers from post-traumatic stress disorder, and at times has difficulty concentrating.

National hired Green as a temporary employee from November 12, 1990, until November 23, 1990. At the time Green made her application for temporary employment in 1990, she advised National that she was unable to do any heavy lifting and could not walk long distances.

National rehired Green as a temporary worker from December 10, 1990, through December 28, 1990, and again from November 12, 1993, (after her automobile accident) through February of 1994. At the time she was rehired in November of 1993, Green advised National of the myriad problems from which she suffered as a result of her automobile accident. National rehired Green with full knowledge of her litany of physical and emotional difficulties.

On June 20, 1994, National *again* rehired Green as a temporary worker. She worked in a temporary capacity until December, 1994, at which time National upgraded her employment status to a permanent position as a clerk in the human resources department.

Green worked extensive amounts of overtime as a permanent employee, including 20.5 hours of overtime the week of January 22 through 29, 1995. On January 31, 1995, Nina Simpson, National's newly hired supervisor in the human resources department, held a staff meeting and advised the employees under her jurisdiction that no one was to work overtime without prior authorization from her.[3] Green was in attendance at that meeting. At the same meeting, as a result of an incident in which Green took home a confidential list

---

1.  Green also alleged a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* and filed suit against her Union, Local 8985 United Steel Workers of America, for failure to adequately represent her. Green's Title VII and ADA claims against National were consolidated with her Title VII and ADA claims against Local 8985. However, Green's Title VII action against National and her claims

2.  In her deposition, Green testified that "photophobia" describes her sensitivity to bright lights.

3.  Nina Simpson assumed the role of Manager of Human Resources on January 23, 1995. Simpson was Green's direct supervisor as of this date.

of prospective employees ("Referral List") after Simpson had specifically told her not to, Simpson also advised that none of the clerks in the department were to take any company documents home, nor could they remove any documents from the human resources department to another department on the company premises.

Having successfully bid for a position with National's Quality Assurance Department, Green was assigned and assumed her new position on February 6, 1995. In an attempt to finish some projects before leaving human resources, Green worked 29.5 hours of overtime in her final week as a human resources clerk despite the fact that just one week prior Simpson had informed the clerks, including Green, of the need to cut back on overtime in the department. Simpson claims that only 8 of those hours were authorized; on the other hand, Green states that all of the hours were authorized.

On the day that Green was to start work in the Quality Assurance Department, February 6, 1995, Simpson observed Green leaving the human resources office with five computer disks. The disks were later discovered to contain the company's Electronic Repair Technician ("ERT") test. The ERT position is classified as one of the highest paid job classifications at National and all applicants must successfully complete a test to qualify for the position. Green claims that she had prior authorization to take the ERT test to work on it on her home computer,[4] even though to do so was clearly contrary to Simpson's general directive of January 31, 1995, to the clerks.

National instituted an investigation and during the week of February 6, 1995, and thereafter, the company discovered that records regarding Green's employment history with the company had been altered in the computer and that Green's physical personnel file had also been tampered with. The investigation specifically uncov-ered facts that reflect that on three occasions in December of 1994, Green's employment dates, as well as her dates of continuous service, were altered. The changes were of such significance that Green would now be entitled to receive additional vacation allowances, more than three years earlier retirement, and a seniority advantage over twenty-five other bargaining unit employees. Additionally, a letter dated December 14, 1994, clarifying Green's seniority and service dates for purposes of pension and vacation benefits, was found to be missing from Green's personnel file.

Each day, the human resources department at National prepares a report summarizing all changes made to its computer system during the previous twenty-four hour period (called a "maintenance run"). The maintenance runs for December of 1994 revealed that on December 1st, 3rd, and 11th, 1994, someone had made changes to Green's seniority and service dates. The authorization identification code necessary to enter such changes into National's computer system was assigned to only the four clerks employed in the human resources department—Green and three other employees. National's payroll records revealed that Green had worked on December 1st, 3rd, and 11th, 1994, and that she was the only human resources clerk working on Sunday, December 11. This information, coupled with the fact that Green was the only one who would benefit from these alterations in her personnel records, led National to conclude that it was Green who had made the changes to the employment records.

Based on the cumulation of all this information, on February 21, 1995, National issued a written notice suspending Green for five days with intent to discharge her, citing Green's insubordination in disobeying Simpson's directives, her unauthorized removal of company property, and her al-

---

4. In her Brief, Green simply asserts that she believed that she had prior authorization to take the ERT test home, but she never identi-fies the person from whom she allegedly received such permission.

teration of personnel records as the reasons for its decision. Thereafter, National terminated Green's employment for these reasons. Under company policy, any of those reasons by itself would be sufficient grounds for discharge.

Green grieved her suspension and termination through the company's and her union's grievance process established by their collective bargaining agreement. The union appealed the company's denials of Green's grievance to the Third Step of the grievance procedure, before making a determination that the grievances lacked sufficient merit to take to arbitration. At no time during the grievance process did Green assert that she was discharged because of her alleged disability. After her grievances were unsuccessful and her union declined to take them to arbitration, Green filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging only that she was terminated because of her disability. After National filed its response to Green's charge and the EEOC investigated, the EEOC dismissed the action and issued a Notice of Right to Sue.

Green filed suit in the Northern District of Indiana, alleging that National violated the ADA in terminating her and in failing to accommodate her disability. She also claimed sexual harassment in violation of Title VII. National filed a motion for summary judgment and the district court granted the same. Green appeals.

## II. ISSUES

On appeal, we consider whether the trial court erred in granting summary judgment to National on Green's failure to accommodate claim and her claim that National discharged her because of her disability, both in alleged violation of the ADA.

## III. DISCUSSION

Green contends that the court's grant of National's motion for summary judgment on her ADA claim was improper. Specifically, she argues that because there are disputed issues of material fact that must be resolved in the light most favorable to Green, the granting of summary judgment was inappropriate.

This Court reviews the trial judge's summary judgment ruling *de novo*, considering the evidence and all inferences that might be drawn from it in the light most favorable to Green. *See Leffel v. Valley Financial Services*, 113 F.3d 787, 791–92 (7th Cir.1997). "As this is an employment discrimination case, we also take care not to resolve any genuine disputes that have been properly established as to the employer's intent and credibility." *Id.* (citation omitted).

Before the Magistrate Judge, Green claimed not only that she was discharged because of her disability but also that National had failed to accommodate her disability. The judge dismissed Green's failure to accommodate claim because she failed to assert this claim in her EEOC complaint. Although she has not specifically flagged the failure to accommodate issue for appeal, Green devotes a portion of the "Statement of Facts" section of her brief to facts demonstrating National's alleged unwillingness to accommodate her disability and she generally appeals the district court's summary judgment ruling. We review whether the court's grant of summary judgment on the failure to accommodate issue was proper, as well as Green's claim that she was terminated because of her alleged disability.

### A. Green's Failure to Accommodate Claim

The ADA makes it unlawful for employers to fail to make reasonable accommodations to the known physical or mental disabilities of an otherwise qualified individual with a disability. *See* 42 U.S.C. § 12112(b)(5)(A). A claim for failure to accommodate is separate and distinct under the ADA from one of disparate treatment because of a disability. *See Weigel*

*v. Target Stores*, 122 F.3d 461, 464 (7th Cir.1997).

This Court has held that a plaintiff is barred from raising a claim in the district court that had not been raised in his or her EEOC charge unless the claim is reasonably related to one of the EEOC charges and can be expected to develop from an investigation into the charges actually raised. *See Cheek v. Western & Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994).

Green alleges that National violated the ADA by failing to make reasonable accommodations for her disability. Specifically, she claims that she was not provided with a suitable desk chair even after she requested one, nor with the appropriate dimmer lighting required by her sensitive eyes. Finally, Green asserts that she stopped parking in the handicapped parking spaces at National because she was told that she did not belong in the handicapped spaces and that the "big wigs" were upset that she was parking there. Green did not include any of these specific allegations in her EEOC complaint; in fact, she did not even allege National's purported failure to accommodate with the EEOC.

As we have stated previously, a failure to accommodate claim is separate and distinct from a claim of discriminatory treatment under the ADA. *See Weigel*, 122 F.3d at 464. In fact, the two types of claims are analyzed differently under the law. *See id.* Therefore, they are not like or reasonably related to one another, and one cannot expect a failure to accommodate claim to develop from an investigation into a claim that an employee was terminated because of a disability. *See, e.g., Marshall v. Federal Express Corp.*, 130 F.3d 1095, 1098 (D.C.Cir.1997) (failure to accommodate claim barred where plaintiff filed an EEOC charge alleging failure to promote based on a disability but made no mention of a failure to accommodate).

For whatever reason, Green neglected to make a "failure to accommodate" argument in her EEOC charge, and we fail to understand how she could expect that her claim that she suffered from inadequate working conditions would develop from the investigation of the reasons for her discharge. Even assuming that National did fail to accommodate Green's alleged disability, that has nothing to do with her complaint that she was wrongfully terminated. We hold that the trial judge's grant of summary judgment in favor of National on Green's failure to accommodate claim was proper.

### B. Green's Disparate Treatment Claim

National asserts that it terminated Green's employment because she worked several hours of unauthorized overtime after she was directed that her supervisor must approve all overtime in advance; she removed and altered company property (the Referral List and the ERT test), and she manipulated personnel records regarding her employment history. Before the trial judge, National submitted computer records, affidavits, and deposition testimony supporting its reasons for terminating Green's employment.

Green contests the company's reasons for discharging her, claiming that she did not participate in any of the activities of which she is accused. She states that Simpson authorized her to work overtime and that she was authorized to take certain company documents home with her, including the ERT test and Referral List, as she had done in the past. Green also denies that she manipulated any information in her employment files. She therefore believes that there exist genuine issues of material fact that preclude summary judgment.

Green's bald assertions that she did not engage in the misbehavior alleged by the company are insufficient to create a material dispute. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). "To

survive a motion for summary judgment, [Green] had to counter the company's affidavits with materials of evidentiary quality (such as affidavits or depositions) that created an issue of fact as to whether the reasons offered by the company were sincere—in [ADA] lingo, not pretextual—or other, discriminatory reasons had played a role in motivating the actions." *Russell v. Acme–Evans Co.*, 51 F.3d 64, 67 (7th Cir. 1995) (citations omitted). Under the law of this Circuit, to defeat National's summary judgment motion Green must provide more than her unsupported pronouncement that National was mistaken. *See id.* at 68 ("If pretext meant simply mistake, a plaintiff's testimony could go far to create a genuine issue of material fact in these cases. But neither in ordinary language nor in the law does it mean a mistake. It means a lie, specifically a phony reason for some action.").

■ This Court has long championed an employer's right to make its own business decisions, even if they are wrong or bad. Therefore, regardless of whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief, we will not second-guess its decisions. *See, e.g., Kariotis v. Navistar Int'l Transportation Corp.*, 131 F.3d 672, 677 (7th Cir. 1997). *See also Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir.1992).

In *Kariotis*, the employer terminated an employee who was on disability leave at the time, claiming that it had evidence that the employee had fraudulently accepted disability benefits and that she was less than truthful with the company when confronted with the allegations of fraud. The employee, who vehemently denied involvement in any such activity, sued her former employer under the ADA, arguing that the company's reasons for terminating her were a pretext for disability discrimination. Affirming the district court's dismissal of the employee's ADA claims, we explained that it is insufficient for an employee to take issue with the accuracy of the employer's reasons for engaging in an adverse employment action:

> To successfully challenge the honesty of the company's reasons she must specifically rebut those reasons. But an opportunity for rebuttal is not an invitation to criticize the employer's evaluation process or simply to question its conclusion about the quality of an employee's performance. Rather, rebuttal must include facts tending to show that the employer's reasons for some negative job action are false, thereby implying (if not actually showing) that the real reason is illegal discrimination.

*Kariotis*, 131 F.3d at 677. We held in *Kariotis* that although the company may well have been mistaken in its beliefs about its employee and perhaps should have conducted a more thorough investigation, there was insufficient evidence from which to conclude that the employer did not honestly believe that the employee had committed fraud.

■ Even assuming, for the sake of argument, that there are legitimate factual disputes as to whether Green engaged in the behaviors for which National claims she was terminated, Green can only prevail in this case if she demonstrates that National did not in good faith believe the reasons it provided for discharging Green. Although there may be room to argue that there are factual disputes over whether Green was authorized to work overtime or to take company documents home, there is no question that Green's employment records were changed in the computer and that a letter was missing from her personnel file. The real issue then becomes whether National had a good faith basis to believe that Green was the responsible party.

In Green's case, the undisputed evidence shows that National had provided only Green and three others with the computer identification code used to alter the records, that Green was on duty on all three relevant dates, and that she was the only

human resources clerk in the office on one of the three dates. It is also undisputed that Green was the only person at National who served to benefit from the changes made to her personnel records. In fact, had the changes gone unnoticed, Green would have been entitled to earlier retirement, additional vacation time, and elevated seniority over twenty-five other bargaining unit employees.

It is "a distraction" for Green to argue about the accuracy of National's assessment of her involvement in the alleged behavior because that is not the determinative issue. *See Kariotis*, 131 F.3d at 677, *citing Brill v. Lante Corp.*, 119 F.3d 1266, 1273 (7th Cir.1997). As we explained in analyzing the ADA claim in *Kariotis*, it simply does not matter whether Green actually manipulated her records so long as National had a good faith basis to believe that she had done so. There is no evidence in the record disputing National's honest belief that Green was the one who had changed her personnel records. Under the circumstances, it was reasonable for National to conclude that Green had altered the documents. Not only did Green have a motive, access, and opportunity, but she also failed to provide any explanation why any of the other three clerks with the identification code would risk their jobs to change her personal employment data that seemed to benefit her alone. Additionally, the fact that National knew of Green's physical and emotional difficulties when it rehired her in 1993 makes the possibility that its reasons for terminating her were a pretext for disability discrimination even less likely. We hold that the Magistrate Judge's entry of summary judgment for National on Green's claim that she was terminated because of her disability in violation of the ADA was proper.

National presented evidence that any of the three reasons it offers for terminating Green, standing alone, would be sufficient grounds for termination. Because we hold that there is no evidence demonstrating that National did not actually believe that Green manipulated the records, we need not discuss the adequacy of proof offered on the other two reasons provided for her termination.[5]

## IV. CONCLUSION

We hold that the district court's grant of summary judgment to National was proper. Green's failure to accommodate claim is barred because she omitted any mention of it from her EEOC complaint, and her disparate treatment claim fails because nothing in the record is sufficient to demonstrate that National did not honestly believe that Green had manipulated her personnel records.

AFFIRMED.

---

5. In light of this Court's holding, we also need not address whether the district court erred in ruling that Green failed to established a prima facie case of disability discrimination. Summary judgment was properly granted even assuming, *arguendo,* that Green established a prima facie case.