In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-3735

JOYCE WHITAKER,

*Plaintiff-Appellant*,

*v.*

MILWAUKEE COUNTY, WISCONSIN,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 2:12-cv-01006-JPS — **J. P. Stadtmueller**, *Judge*.

ARGUED APRIL 15, 2014 — DECIDED DATE NOVEMBER 25, 2014

Before RIPPLE and WILLIAMS, *Circuit Judges*, and ST. EVE, *District Judge*.[*]

RIPPLE, *Circuit Judge*. Joyce Whitaker brought this action against her former employer, Milwaukee County, alleging that she was discriminated against in violation of the Americans with Disabilities Act ("ADA" or "Act"), 42 U.S.C.

---

[*] The Honorable Amy J. St. Eve, of the United States District Court for the Northern District of Illinois, sitting by designation.

§ 12101 *et seq.* She specifically alleged that her employer had failed to accommodate her disability by refusing to extend her period of medical leave, refusing to transfer her to another position, and then terminating her for reasons related to her disability. Milwaukee County (the "County") moved for summary judgment, which the district court granted. Ms. Whitaker now appeals. She challenges the district court's conclusion that her complaint impermissibly went beyond the scope of her EEOC charge and that Milwaukee County was not her "employer" under the statute.

We affirm the judgment of the district court. We conclude that, although Milwaukee County was Ms. Whitaker's official employer and was responsible for her compensation, it had no involvement in the principal decisions that she claims violated the statute and no authority to override those decisions, made by the State of Wisconsin's Department of Health Services personnel. Accordingly, the County cannot be held liable under the ADA for those decisions. Because the district court's judgment in favor of the County on the termination and denial of accommodation claims must be upheld on this basis, we need not consider whether that court erred in determining the scope of the charge as it concerns State conduct. With respect to whether the County is liable for any of its own actions, we hold Ms. Whitaker's allegations on these matters are outside the scope of her EEOC charge, and, therefore, we cannot consider them. We therefore affirm the district court's grant of summary judgment to Milwaukee County.

# I

# BACKGROUND

## A.

Beginning in 2001, Ms. Whitaker worked as a corrections officer for the County. In 2005, she sustained a work-related injury to her back and subsequently was diagnosed with degenerative lumbar disk disease and symptoms of chronic diskogenic low back pain and sciatica. As a result of these back conditions, she has physician-imposed permanent work restrictions and substantial limitations in a number of tasks, including sitting, standing, and walking. Through the County's employment relocation program, Ms. Whitaker was hired in 2006 as an Energy Assistance Specialist as an accommodation for her back disability. Later, in 2008, Ms. Whitaker became an Economic Support Specialist in the County's income maintenance (i.e., public benefits) program, where she continued until her termination in 2010.

In 2009, Wisconsin enacted a statute that directed the State's Department of Health Services ("DHS") to establish a unit to administer public assistance programs in Milwaukee County. *See* 2009 Wisconsin Act 15, § 22 (codified at Wis. Stat. § 49.825). The County previously had administered those functions through the unit in which Ms. Whitaker worked. Following the transition to State management, Ms. Whitaker remained an employee of the County, but worked in the DHS unit, now called Milwaukee County Enrollment Services ("MilES"). She retained her County badge and her membership (with seniority) in the union of County employees. She was compensated and received benefits from the County. This arrangement conformed to

the statute transferring administration to DHS. *See* Wis. Stat. § 49.825(3).

All of Ms. Whitaker's supervisors, however, were employees of Wisconsin DHS, as required by the statute, and they managed the day-to-day affairs of the office with no input from County officials.[1] *See id.* § 49.825(3)(a). Her DHS supervisors had "the authority to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, discipline, and adjust grievances with respect to, and state supervisory employees may supervise, county employees performing services … for the unit." *Id.* § 49.825(3)(b)(1). DHS employees also administered the leave program and had authority to resolve disputes with the applicable union.[2] The transition began in May 2009, and the State had assumed full responsibility for the program by January 1, 2010. Ms. Whitaker does not allege that any County employees had involvement in any adverse employment actions taken with respect to her once the transfer to DHS administration was complete.

During her employment—both before and after the transition to DHS administration—Ms. Whitaker complained that at least one of her supervisors, MilES Deputy Director Vanessa Robertson, had ignored regularly her permanent work restrictions;[3] Ms. Whitaker, however,

---

[1] Supervisory employees under the previous County regime transitioned to State DHS employees with the transfer of administration.

[2] In addition to the dictates of the statute, the status of the workers vis-à-vis the County and State was memorialized in a memorandum of understanding between the County's union and the State in 2009.

[3] *See, e.g.*, R.43-10 at 37–40.

did not file an EEOC complaint. She did request and receive a work accommodation in January 2010 from a DHS compliance officer relating to her ability to sit for only short periods. Six months later, in June 2010, Nicole Teasley, a human resources specialist for DHS, approved a request for intermittent leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601–54.

On August 27, 2010, Ms. Whitaker aggravated her existing back disability. She then requested continuous FMLA leave, which also was approved in August by Teasley for an initial period of two weeks. One day before its expiration, Ms. Whitaker again requested continuous leave under the FMLA, this time citing both her own limitations and a need to provide care for her father. Teasley again approved the request, authorizing leave from September 8 through October 18. Teasley's letter noted that Ms. Whitaker's FMLA leave would be exhausted on October 19, 2010, and that she would then have an opportunity under her employment contract to request a leave of absence without pay for up to thirty days. On October 18, 2010, Ms. Whitaker forwarded to Teasley a request for a leave of absence, again citing her own condition and her need to care for her father; she requested a return-to-work date of December 28, 2010. On October 25, 2010, Teasley approved in part and denied in part Ms. Whitaker's request, allowing a contractual leave of absence only through November 5, 2010. A separate letter of the same date from Deputy Director Robertson reiterated that FMLA leave was exhausted and stated that Ms. Whitaker was expected to return to work on

November 8, 2010, and that, if she did not return, DHS would "begin the process for medical separation."[4]

Ms. Whitaker did not return to work as scheduled. Her physician sent FMLA medical certifications on three occasions extending her need for medical leave first to mid-November, then mid-December, then mid-January 2011. In the meantime, however, by further letter dated November 15, 2010, Robertson provided Ms. Whitaker with a notice of intent to terminate her for medical reasons and explained the state statutory authority for termination of an employee who has exhausted available leave and remained unable to return to work. It also noted that employees who were medically separated would be referred to the County's Job Accommodations Coordinator to seek an alternative placement during a six-month leave of absence.[5] A County human resources representative was copied on the correspondence.[6] The letter also set a meeting on November 18th to discuss the proposed action. Ms. Whitaker attended the meeting along with a union representative, Teasley, and Robertson, and she confirmed that she was unable to return to work. DHS representatives reiterated their intent to terminate her. A confirmation letter from another DHS employee recited that Ms. Whitaker was "terminated

---

[4] *Id.* at 15.

[5] Ms. Whitaker apparently was not referred to this program, and the program was not notified of her medical separation. According to the Coordinator, the County had no authority to transfer employees through this program once the transition to DHS supervision of MilES was complete. *See* R.46 at 2.

[6] *See* R.43-10 at 14.

effective November 30, 2010 for medical reasons," and the County's human resources director received a copy.[7]

Meanwhile, on November 3, 2010—prior to receiving Robertson's notice of intent to terminate—Ms. Whitaker had filed a charge with the EEOC naming both Milwaukee County and Wisconsin DHS as employers. The charge stated: "I believe that I have been discharged on the basis of my disability in violation of" the ADA.[8] It gave October 25, 2010—the date on which she was informed that her FMLA leave was exhausted and that she was required to return on November 8—as the only date of discrimination. The box available for "continuing action" was not selected. The EEOC issued a right to sue letter on July 26, 2012, and sent a dismissal letter on May 8, 2013, in which it stated that it was unable to conclude that there had been a violation of the statutes.

## B.

Ms. Whitaker brought this action in the district court and initially named both Milwaukee County and Wisconsin DHS as defendants. Wisconsin DHS then moved successfully for its dismissal from the action on the basis of Eleventh Amendment immunity. Ms. Whitaker filed an amended complaint, and Milwaukee County, now the sole defendant, moved for summary judgment on March 28, 2013. On November 6, 2013, with trial set for February, Ms. Whitaker moved for leave to file a second amended complaint. On

---

[7] R.64-1 at 68.

[8] *Id.* at 54.

November 12, 2013, in a single order, the district court denied Ms. Whitaker's motion for leave and granted the County's motion for summary judgment.

With respect to the motion to file a second amended complaint, Ms. Whitaker principally sought to rejoin Wisconsin DHS as a defendant and to add a claim under the Rehabilitation Act. The district court's decision denying leave concluded that granting the motion would unduly delay the proceedings and prejudice the County.[9] It noted that the matter had been pending for more than a year and that no explanation had been provided for the delay.[10] Because the operative facts were all known at the time of the first amendment, the court concluded that the only explanation was that the additional claim was "belatedly-identified."[11] It also held that adding DHS and a new theory of liability would prejudice Milwaukee County, which had "answered, engaged in discovery, and fully briefed a motion for summary judgment predicated upon the amended complaint."[12] In the district court's view, if the amendment were allowed, "Milwaukee County would have to reassess its entire strategy in this matter, laying waste to significant efforts made in its defense."[13]

---

[9] R.57 at 7 ("Whitaker's motion was filed much too late in the proceedings….").

[10] The record contains no explanation as to why a Rehabilitation Act claim was not contained in the initial complaint.

[11] *Id.*

[12] *Id.* at 8.

[13] *Id.* The district court's decision on this point is not before us on this appeal, and we express no view with respect to the matter.

Having determined that Ms. Whitaker could proceed only against the County under the ADA, the court then turned to the County's motion for summary judgment. It noted that Ms. Whitaker's amended complaint made three claims related to a failure to accommodate as well as one claim for unlawful termination, while her EEOC charge referenced only her termination. It ruled that the additional claims were not "like or reasonably related to"[14] the claim included within the charge, finding the case analogous to *Green v. National Steel Corp., Midwest Division*, 197 F.3d 894 (7th Cir. 1999). Accordingly, the district court dismissed as unexhausted all of the failure-to-accommodate claims.

Turning to the remaining termination claim, the district court held that Ms. Whitaker's claims against the County as a "joint employer" with DHS "fail[ed] as a matter of procedure and merit."[15] Procedurally, the court held that Ms. Whitaker could not argue a joint employer theory because, in her pleadings, she had alleged an agency relationship between the County and Wisconsin DHS. The district court viewed this argument as an unacceptable attempt to amend the pleadings through summary judgment argument and raise a new theory of liability in opposition briefing to summary judgment. Because this claim "was not timely raised," the County "did not have adequate notice" of the theory, and the court declined to "consider this argument in its analysis of Milwaukee County's motion for summary judgment."[16]

---

[14] *Id.* at 9 (internal quotation marks omitted).

[15] *Id.* at 11.

[16] *Id.* at 13–14.

The court then held that Milwaukee County was not properly liable for allegedly discriminatory acts performed by DHS. "The undisputed facts show that Milwaukee County did not act with regard to Whitaker's termination; rather, the facts demonstrate the direct opposite, namely that Milwaukee County had no power to act."[17] The court therefore entered summary judgment for the County.

Ms. Whitaker now appeals. She challenges the district court's determinations that (1) it would not consider a joint employer theory of liability on the merits; and (2) her failure-to-accommodate claims are outside the scope of her EEOC charge.

## II

## DISCUSSION

### A.

Ms. Whitaker's amended complaint includes several allegations that there was an agency relationship between the County and Wisconsin DHS such that the County could be liable for discriminatory acts by DHS employees. Ms. Whitaker apparently abandoned this theory at some point before summary judgment, where she argued, in opposition to the County's motion, that the County and Wisconsin DHS were "joint employers." The district court rejected the joint employer argument on the basis that it was raised inappropriately in response to summary judgment and was an attempt to amend the pleadings. The court relied

---

[17] *Id.* at 16.

principally on *Shanahan v. City of Chicago*, 82 F.3d 776 (7th Cir. 1996), and *Abuelyaman v. Illinois State University*, 667 F.3d 800 (7th Cir. 2011). The district court viewed these cases as standing for the principle that a party may neither amend its pleadings by argument in opposition to summary judgment nor introduce new theories of liability in opposition to summary judgment.

We start our own analysis with a review of the principal cases upon which the district court relied. In *Shanahan*, the plaintiff made a First Amendment claim, alleging that he had been demoted because he had refused to hire political supporters of the mayor. 82 F.3d at 777. When the defendants responded at summary judgment that they did not know the political affiliation of the relevant employees, the plaintiff responded that it was in fact the employees' union membership and the union's support for the mayor that motivated the action. We determined that the district court properly denied leave to amend the complaint to add this allegation when it was raised in response to summary judgment. Notably, we commented that the plaintiff's action was an impermissible attempt to "amend his complaint." *Id.* at 781. The plaintiff had altered radically the factual basis of his complaint at summary judgment. Similarly, in *Abueleyaman*, a professor alleged various forms of discrimination and retaliation in his complaint. 667 F.3d at 806. In his response to a summary judgment motion, he added an entirely new *factual* basis for retaliation not previously presented. Again, we approved of the district court's refusal to consider the new "theory." *Id.* at 813–14.

In each case, new and drastic factual allegations of motivation for the discriminating party's action were

proffered at the summary judgment stage. The plaintiff sought to introduce a new factual basis not previously presented in the pleadings for a claim. These cases are compatible with our cases that emphasize that it is factual allegations, not legal theories, that must be pleaded in a complaint. In *Del Marcelle v. Brown County Corp.*, 680 F.3d 887 (7th Cir. 2012) (en banc), we stated explicitly that "plaintiffs are not required to plead legal theories, even in the new world of pleading that is developing in the wake of the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)." *Del Marcelle*, 680 F.3d at 909 (parallel citations omitted).[18] More recently, the Supreme Court has confirmed explicitly this principle. *Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014) (per curiam). In the cases relied upon by the district court, new factual bases for claims or legal claims were at the center of the analysis.

---

[18] *See also Alden Mgmt. Servs., Inc. v. Chao*, 532 F.3d 578, 582 (7th Cir. 2008) ("Courts don't hold a party to its first legal theory. One does not plead law… ."); *Bartholet v. Reishauer A.G. (Zurich)*, 953 F.2d 1073, 1078 (7th Cir. 1992) ("[T]he complaint need not identify a legal theory, and specifying an incorrect theory is not fatal.").

A plaintiff may, of course, plead herself out of court with *factual* allegations that disprove the theory she ultimately pursues, but that did not occur in this case. Ms. Whitaker made allegations of agency that she was not able to support with facts at summary judgment, but her allegations themselves did not provide the County with any "impenetrable defense" to her claims. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008) ("[O]ur pleading rules do not tolerate factual inconsistencies in a complaint, [but] they do permit inconsistencies in legal theories.").

The situation presented in the present case is significantly different and, in our view, requires a different approach. Ms. Whitaker has alleged, from the beginning, that the relationship of the County and Wisconsin DHS is such that the County is liable for the actions of the DHS supervisors who denied her additional leave and terminated her through medical separation. This fundamental factual allegation always has been supported by identical facts about her employment relationship. There is no material dispute about those facts. Ms. Whitaker did not attempt to add a new substantive claim or even a new factual theory of liability; she offered an alternative legal characterization of the factual relationship between the two governmental entities, a characterization that she believes supports her claim of County liability for DHS's adverse employment actions.[19] We do not believe that this new characterization offered any unfair surprise.

---

[19] The County's response asserts that Ms. Whitaker took a "directly contrary" position in her complaint and that her attempted change "surprise[d]" the County unfairly. Appellee's Br. 6. Indeed, under certain limited circumstances, we have held that it is appropriate to hold a plaintiff to an initial legal theory.

> With immaterial exceptions, the rules require only the pleading of a claim…. So there is no burden on the plaintiff to justify its altering its original theory. *Which is not to say that such an alteration is always permissible.* If the complaint explicitly or implicitly disclaims certain legal characterizations of the claim, an effort to retract the disclaimer may come as a surprise to the defendant and make it more costly or difficult for him to defend, or may simply protract the lawsuit inexcusably. Or by tacit agreement of the parties a possible interpretation of the

In short, the rule that the district court discerned from our cases is correct but inapplicable, and Ms. Whitaker should have been permitted to present her "joint employer" theory. We therefore consider the merits of that argument here.

**B.**

The principal question presented in this appeal is whether the County can be held liable for actions of Wisconsin DHS that are alleged to violate the ADA. The ADA creates a cause of action for qualified individuals with

---

> complaint may simply not be pursued—the case may develop along quite other lines—and an effort to redirect the case may cause unreasonable delay even if there is no surprise to the defendant. In either of these cases the district court can and should hold the plaintiff to his original theory.

*Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996) (emphasis added) (citations omitted). In the present case, however, we cannot accept this view. Ms. Whitaker's position is not contrary or surprising in the manner described in the case law; it simply does not stray sufficiently from her initial position to be rejected on this basis. *See, e.g.*, *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1428–30 (7th Cir. 1993) (plaintiff unable to amend claim where prior position supported favorable treatment by EPA and change to new position in later litigation would be unfair and contradictory); *Johnson v. Methodist Med. Ctr. of Ill.*, 10 F.3d 1300, 1304 (7th Cir. 1993) (plaintiff unable to amend to add allegations that medical negligence was caused in ways not contemplated by the original complaint, including different actors, at a late stage in proceedings). Furthermore, the County's contention that it was surprised is unpersuasive when the alternate legal basis for liability is based on the same allegations and the undisputed factual relationship between the relevant entities.

a disability where there has been "discriminat[ion]…in regard to…[the] discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment" by a "covered entity." 42 U.S.C. § 12112(a). A "covered entity" includes an employer meeting certain minimum qualifications, *see id.* § 12111(2), (5)(A), and it is undisputed that Wisconsin DHS and the County both meet the minimum statutory qualifications. But in order to assert her rights under the ADA as an employee, Ms. Whitaker must establish that she was "employed by" the employer that she seeks to hold liable. *Id.* § 12111(4).

It is undisputed that, by virtue of 2009 Wisconsin Act 15, Ms. Whitaker was retained, as a formal matter, as an employee of the County. *See* Wis. Stat. § 49.825(3). She remained a member of the union of County employees, and the County remained responsible for the "administrative tasks related to payroll and benefits" for Ms. Whitaker and her colleagues. *Id.* § 49.825(3)(c). Her supervisors, who are the relevant decisionmakers in the present case, however, were required by statute to be employees of Wisconsin DHS. *Id.* § 49.825(3)(a). Those State employees had the exclusive "authority to…discharge[]…and…supervise[] county employees" and controlled the day-to-day activities of staff who worked for the MilES unit. *Id.* § 49.825(3)(b)(1).

In light of the complex relationships that sometimes exist between individuals and the modern entities for which they work, courts have fashioned a number of tests that determine when a particular employer may be subject to liability under the ADA and related civil rights statutes. Specifically, when more than one entity is potentially involved in the employment relationship, two prominent

tests have been applied by various courts to determine who qualifies as an employer under the statute. One argues that two nominally distinct entities in fact comprise a "single employer"; the other acknowledges that two entities are, in fact, distinct, but concerns whether each exercises sufficient control over the terms and conditions of employment such that they are "joint employers," either of which faces potential liability under the statute. *See, e.g.*, *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1226–27 (10th Cir. 2014). Ms. Whitaker focuses on the joint employer test.

The joint employer concept derives from labor law, *see, e.g.*, *DiMucci Constr. Co. v. NLRB*, 24 F.3d 949, 953 (7th Cir. 1994) (citing *Boire v. Greyhound Corp.*, 376 U.S. 473 (1964) (representation case)); it has been employed infrequently in employment cases in this circuit, *see, e.g.*, *Robinson v. Sappington*, 351 F.3d 317, 332 n.9 & 337–39 (7th Cir. 2003) (noting the possibility that an entity qualified as a joint employer in Title VII case, but finding it unnecessary to resolve the question).

In the traditional labor law context, the "joint-employer" language is designed to identify the business entities that control the employees' terms and conditions of employment. As one of our sister circuits has stated:

> The basis of the finding [of a joint employer] is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus, the "joint employer" concept recognizes that the

> business entities involved are in fact separate but that they *share* or co-determine those matters governing the essential terms and conditions of employment.

*NLRB v. Browning-Ferris Indus. of Pa., Inc.*, 691 F.2d 1117, 1123 (3d Cir. 1982) (emphasis in original) (citation omitted). In the same context, we have stated that an entity *other than the actual employer* may be considered a "joint employer" "only if it exerted significant control over" the employee. *G. Heileman Brewing Co. v. NLRB*, 879 F.2d 1526, 1530 (7th Cir. 1989). "Factors to consider in determining joint employer status are (1) supervision of employees' day-to-day activities; (2) authority to hire or fire employees; (3) promulgation of work rules and conditions of employment; (4) issuance of work assignments; and (5) issuance of operating instructions." *DiMucci Constr. Co.*, 24 F.3d at 952. We also have held, however, "that for a joint-employer relationship to exist, each alleged employer must exercise control over the working conditions of the employee, although the ultimate determination will vary depending on the specific facts of each case." *Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640, 644 (7th Cir. 2008) (emphasis added) (deciding a case under the FMLA, which includes joint employer regulations promulgated by the Department of Labor).

We regard reliance on traditional labor law principles to be an awkward approach to determining Title VII liability. The issue previously has been put before us, but we have not employed the labor standards in the manner now urged by Ms. Whitaker. *Robinson v. Sappington*, 351 F.3d 317, was a Title VII case also involving employees divided among the

state and county and in which the plaintiff alleged joint employment by the county and the state. Her harasser, a state court judge, was clearly an employee of the state. She sued various state officials in their official capacities, and she also sued the county. In addressing the issue, we noted:

> [T]here is at least a preliminary question of who, or what entity, is the proper defendant with respect to Ms. Robinson's Title VII action. It is only the employee's employer who may be held liable under Title VII. We explained in *Williams* [*v. Banning*, 72 F.3d 552, 553 (7th Cir. 1995),] that the term "employer" as used in Title VII is a statutory expression of traditional principles of respondeat superior liability. In the context of a sexual harassment claim, the employee's employer usually is that of the harassing supervisor, and thus it is rational and consistent with standard agency principles to impute liability to the employer based on the actions of the supervisory employee.

> In the present case, there is no question that [the defendants] are employees of the State of Illinois. As such, any harassment inflicted by them on lower-level state employees under their direction can be imputed to the State of Illinois.

*Id.* at 332 n.9 (citation omitted). With respect to whether the defendant county could face liability for the actions of the state-employed judge, we noted that the plaintiff had put forward such a claim, but we found it unnecessary to resolve. *Id.* at 337–39.

Some of our sister circuits have held explicitly that establishing a "joint employer" relationship does not create liability in the co-employer for actions taken by the other employer. *See Torres-Negrón v. Merck & Co.*, 488 F.3d 34, 41 n.6 (1st Cir. 2007) ("[J]oint-employer liability does not by itself implicate vicarious liability.…[A] finding that two companies are an employee's 'joint employers' only affects each employer's liability to the employee for their *own* actions, not for each other's actions…." (emphasis in original)); *see also id.* (citing *Virgo v. Riviera Beach Assoc.*, 30 F.3d 1350, 1359–63 (11th Cir. 1994), for the proposition that agency principles apply to determine liability of each company, even when a joint employer relationship has been found); *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1244-45 (11th Cir. 1998) (finding no liability, regardless of the technical outcome of the joint employer inquiry, where the defendant entity had no involvement in the challenged employment action).[20]

This view finds support in the EEOC's own Compliance Manual. The relevant guidance addressing joint employment relationships suggests that the purpose of establishing joint employer status is to make an entity other than the principal employer liable for conduct relating to a specific employee. Written for the specific context of temporary employment agencies sending employees to

---

[20] Another circuit explicitly has reserved the question. *See Sandoval v. City of Boulder, Colorado*, 388 F.3d 1312, 1324 n.4 (10th Cir. 2004) ("Because we find no joint employer relationship we need not reach the question of what the scope of one joint employer's vicarious liability would be for actions of its partner in which it did not participate or over which it had limited or no control.").

clients, the guidance specifically addresses whether, when the firm and client qualify as joint employers, the firm can be responsible for discriminatory actions taken by the client. It concludes:

> The firm is liable *if it participates* in the client's discrimination. For example, if the firm honors its client's request to remove a worker from a job assignment for a discriminatory reason and replace him or her with an individual outside the worker's protected class, the firm is liable for the discriminatory discharge. The firm also is liable if it *knew or should have known about the client's discrimination and failed to undertake prompt corrective measures within its control*.

EEOC, No. 915.002, Enforcement Guidance: Application of EEO Laws to Contingent Workers Placed by Temporary Employment Agencies and Other Staffing Firms, at 2260 (1997) (emphasis added). We have no reason to depart from the course set by the other circuits and the view expressed by the agency charged with the administration of the statute.[21]

---

[21] The secondary literature confirms the general purpose of joint employer liability as bringing another entity under the statute. *See* Barbara Lindemann & Paul Grossman, *Employment Discrimination Law* 1312 (3d ed. 1996) (noting that the joint employer "theory generally is used to obtain jurisdiction over a company that is unrelated to the employer-in-fact but which exercises sufficient day-to-day control over a charging party's work to be treated as a co-employer of the charging party").

Here, nothing in the record suggests that the County participated in the alleged discriminatory conduct or failed to take corrective measures within its control. The use of the joint-employer device here is an attempt to obtain relief for alleged State-employee misconduct despite the State's immunity under the ADA, *see generally Bd. of Trs. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 374 (2001), and despite Ms. Whitaker's delayed and unsuccessful attempt to re-add the State as a defendant with new claims under the Rehabilitation Act.

## C.

Ms. Whitaker also asks that we review the district court's decision that her reasonable accommodation claims were barred because she had failed to raise them in her original EEOC complaint. We begin by examining the principles that must govern our decision.

An ADA plaintiff must file a charge with the EEOC before bringing a court action against an employer. 42 U.S.C. § 12117(a) (incorporating multiple sections, including 42 U.S.C. § 2000e-5(e)(1) and (f)(1)). "[A] plaintiff is barred from raising a claim in the district court that had not been raised in his or her EEOC charge unless the claim is reasonably related to one of the EEOC charges and can be expected to develop from an investigation into the charges actually raised." *Green*, 197 F.3d at 898; *see also Rush v. McDonald's Corp.*, 966 F.2d 1104, 1110 (7th Cir. 1992) ("An aggrieved employee may not complain to the EEOC of only certain instances of discrimination, and then seek judicial relief for different instances of discrimination."). We have said that in

order for claims to be reasonably related to one another, there must be "a factual relationship between them." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 501 (7th Cir. 1994). This means that the EEOC charge and the complaint must, at minimum, "describe the *same conduct* and implicate the *same individuals*." *Id.* (emphasis in original). With these principles in mind, we turn to the situation now before us.

Ms. Whitaker's charge read:

I have been out on a medical leave of absence since September 1, 2010. In a letter dated October 25, 2010 I was notified by Vanessa Robertson, Deputy Director of MILES, that I would be terminated if I failed to return to work by November 8, 2010. I am unable to return at that time due to medical reasons. I believe that I have been discharged on the basis of my disability in violation of Title I of the Americans with Disabilities Act of 1990.[22]

The district court, and the County, rely exclusively on *Green*, 197 F.3d 894, in which we stated:

[A] failure to accommodate claim is separate and distinct from a claim of discriminatory treatment under the ADA. In fact, the two types of claims are analyzed differently under the law. Therefore, they are not like or reasonably related to one another, and one cannot expect a failure to accommodate claim to develop from an investigation into a claim

---

[22] R.64-1 at 54.

> that an employee was terminated because of a
> disability.

*Id.* at 898 (internal citations omitted).

The EEOC, appearing as amicus curiae, suggests, at least obliquely, that some of the language in these cases is more rigid than appropriate if that language is to be read as stating a general proposition of law rather than a commentary on the factual circumstances in *Green.* It takes no issue with our statement in *Green* that a claim not raised in an EEOC charge can be raised in the district court only if that claim "'is reasonably related to one of the EEOC charges and can be expected to develop from an investigation into the charges actually raised.'"[23] In the EEOC's view, there can be cases where a discriminatory termination claim can be so closely related to a reasonable accommodation claim that it would be appropriate to consider an unstated reasonable accommodation claim along with a stated discriminatory discharge claim. In its view, in *Green,* there was no factual connection between the discharge for various forms of employee misconduct and the employee's requests for working conditions suitable to her disability. Here, by contrast, suggests the EEOC, an investigation of the wrongful termination claim inevitably would address her requests for an extension for her leave, and the summary judgment record supports that it did.[24]

---

[23] Br. of the EEOC as Amicus Curiae Supporting Appellant at 6 (quoting *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 898 (7th Cir. 1999)).

[24] *See* R.64-1 at 55.

Given our determination, earlier in this opinion, that the County cannot be held liable for the personnel actions of the State, this case presents no occasion for us to determine whether Ms. Whitaker's accommodation claims concerning additional leave, denied by *State* employees, can be considered even though they were not raised in the EEOC complaint. Any refinement of our approach to *Green* must therefore await a case in which the issue is necessary for decision.[25]

We now turn to Ms. Whitaker's other accommodation claim. She points to the DHS letter of November 15, 2010, informing her of her imminent discharge. In that letter, DHS recites that, if she is in fact terminated, she would be referred to Sue Chase, the Job Accommodations Coordinator for Milwaukee County. According to the letter,

> Ms. Chase will work[] with individuals with severe disabilities to seek alternative civil service positions in Milwaukee county governments through an alternative certification process provided by the DECA program. Employees who have permanent medical restrictions are referred to this program[ and] are placed on a medical leave of absence for up to six months by the departments. This period is used by the Job Accommodation Coordinator to work with county central Human Resources to locate placement for the affected staff. If no job

---

[25] We appreciate the EEOC's assistance in our consideration of this case.

> placement is possible at the end of the six months, then the department moves forward with separation from employment through the Personnel Review Board.[26]

Ms. Whitaker claims that, because this referral and new placement never materialized, the County ought to be held responsible for a failure to accommodate her disability.

Like her claims that DHS should have granted her an extension of leave, this claim was not raised in her EEOC charge, but was raised and preserved adequately at each stage of her federal court litigation. At first glance, this claim might appear to present the situation to which the EEOC invites our attention. Here, it might be argued, the offer of accommodation is inextricably linked to the discharge and therefore certainly within the expected purview of an EEOC investigation of the discharge. Several factors militate against such a characterization. First, we think that the referral described in the letter contemplated *post-termination* assistance to Ms. Whitaker. Second, any failure to make the referral on the part of DHS is, for the reasons we have already discussed, not properly before us since DHS is not, at this point, a party to this litigation. Finally—and most importantly—the officer of County government responsible for the administration of this program has stated by affidavit, submitted in support of summary judgment, that Ms. Whitaker was not referred to the program and, furthermore, that, even if she had been referred, the program had no authority to transfer an employee who was part of

---

[26] R.64-1 at 66–67.

the MilES program. Ms. Whitaker has not answered satisfactorily the factual assertions of this affidavit.

Accordingly, we must conclude that the district court properly granted summary judgment on this claim.

## Conclusion

Regardless of whether the State of Wisconsin was a joint employer of Ms. Whitaker, the County bears no responsibility for the actions of State employees who supervised Ms. Whitaker. With respect to the County's own actions for allegedly failing to accommodate her disability, Ms. Whitaker has not fulfilled her administrative exhaustion requirements, and we therefore do not address her claims. The judgment of the district court for the County is affirmed.

AFFIRMED